# United States Court of Appeals
## For the First Circuit

No. 05-2703

UNITED STATES OF AMERICA,

Appellee,

v.

ERIC HOLT,

Defendant, Appellant,

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Dyk,* Circuit Judges.

    Mary Davis for the appellant.
    Margaret D. McGaughey, Appellate Chief, with whom, Paula D. Silsby, United States Attorney, was on brief, for the appellee.

September 28, 2006

*Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**. Eric Holt appeals from his conviction, under the Gun Control Act, 18 U.S.C. § 922(g)(4) (2000), of possession of a firearm by a person who has been committed to a mental institution. Holt argues that he was not "committed" to a mental institution under the meaning of the statute. He also urges the court's instructions concerning possession were erroneous. We reject both contentions and affirm.

## I.

In February of 2004, Holt was having marital problems with his wife, when she announced that she wanted a divorce. Holt temporarily moved in with his friend, Christopher Norbert. Holt suffered major depression as a result of the separation from his wife and a recent arrest. Norbert testified that, during this time, Holt threatened his wife, stating that he wanted to "splatter his wife's brains out." Holt's son testified that he was concerned that Holt would hurt himself.

On February 16, 2004, a licensed clinical social worker, Marc Quirion, made an application for Holt's involuntary admission to a mental institution. Pursuant to Maine's involuntary admission procedures, this application was included a medical certification. Alfonso Corona, a licensed psychiatrist and medical doctor, certified that he examined Holt and that Holt posed a "likelihood of serious harm due to a mental illness . . . ." The next day, on

February 17, the application was reviewed by a Maine District Court Judge, who then authorized the county sheriffs to transport Holt to a medical facility. What transpired after this point with respect to Holt's admission to the medical facility and the duration of such admission is not apparent from the record. It is clear, however, that by May 10, 2004, Holt was no longer in a medical facility and was staying with his friend, Norbert.

On May 11, 2004, Holt was cleaning out his truck—which had been parked in Norbert's driveway for several months (before Holt's admission to the mental hospital)—when he uncovered a handgun. Holt brought the gun into Norbert's house, and Holt and Norbert allegedly discussed what to do with the gun; both believed that Holt was prohibited from possessing a firearm. Norbert testified that Holt was reluctant to surrender the gun. The two men eventually decided that Norbert would take the gun to his parent's house. In the meantime, Norbert put the unloaded gun in his gym bag in the cellar, where Holt was staying. According to testimony by the probation officer who found the gun, Holt seemed unaware that the gun was in the gym bag. Ammunition for the gun was found in a dresser in Norbert's bedroom.

The next day, Troy Thornton, Holt's probation officer, came to Norbert's house with a police officer to make a home visit and search for weapons. After Norbert consented to the search, the officers discovered the gun and ammunition. Holt was charged with,

and tried for, violating 18 U.S.C. § 922(g)(4), which makes it unlawful for anyone "who has been committed to a mental institution" to "possess" a firearm.

During the trial, the defense raised two issues which are pertinent to this appeal. First, defense counsel proposed that the term "committed" be left undefined for the jury, or alternatively, that the jury be instructed that a commitment occurs only after an application for involuntary commitment has been approved by a state judge, the person has been taken to a medical facility, and a follow-up examination has been performed within 24 hours of the involuntary admission. Over the defendant's objection, the district court rejected both proposals and instead instructed the jury that "[a]n involuntary commitment occurs when a State Judge, pursuant to an application for involuntary admission to a mental hospital, authorizes the sheriff to take the person into custody and transport him to a hospital."

Second, over the defendant's objection, the district court instructed the jury that:

> The term "possess" means to exercise authority, dominion or control over something. It is not necessarily the same as legal ownership. Possession includes both actual and constructive possession. A person who has direct physical control of something on or around his or her person is then in actual possession of it. A person who is not in actual possession, but who has both the power and the intention to exercise control over something is in constructive possession of it. Briefness of contact alone does not preclude a finding of possession . . . . The word "knowingly" means that the possession was

-4-

> voluntary and intentional, not because of mistake or accident.

Appellant's Addendum at 5. In so doing, the district court rejected the defendant's proposed additional instructions which would have noted that "[a]n act is done knowingly if it is done voluntarily and intentionally, and not because of mistake or accident or for some other innocent reason," and that "[i]ntent is necessary to possession, and the requisite intent is to exercise authority, dominion or control." Appellant's Br. at 24 (emphasis added).

Thereafter, the jury found Holt guilty of possessing a firearm after having been committed to a mental institution. Holt timely appealed his conviction. We have jurisdiction pursuant to 28 U.S.C. § 1291 (2000).

## II.

The pertinent statute, 18 U.S.C. § 922(g)(4), states that "[i]t shall be unlawful for any person . . . who has been committed to a mental institution . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . ."

18 U.S.C. § 922(g)(4) is part of an extensive statute, the Gun Control Act of 1968, designed to regulate various aspects of gun ownership; it expands the categories of persons prohibited from possessing guns, including drug users, illegal aliens,

dishonorably discharged service members, and people who have renounced their citizenship. 18 U.S.C. § 922(g). Congress wanted to keep guns out of the hands of people perceived to be dangerous, and not just those who had permanently been confined to a mental institute or those who continue to suffer from a mental illness. Rather, Congress intended to prohibit persons who are mentally unstable or "mentally irresponsible" from possessing guns. 114 Cong. Rec. 21780, 21791, 21801 (1968). Essentially, "Congress' intent in enacting §[] 922(g) . . . was to keep firearms out of the hands of presumptively risky people." Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 112 n.6 (1983) (emphasis added).

The harshness of the prohibition against persons who have been "committed" to a mental institute, however, was ameliorated by section 925(c) of the statute, which provides that the Attorney General may grant relief to a prohibited person if:

> it is established to [the Attorney General's] satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.

18 U.S.C. § 925(c) (2006). Under the regulations, to be eligible for such relief, the applicant must show "the applicant's discharge from commitment, [and the] restoration of mental competency . . . ." 27 C.F.R. § 478.144(c)(5) (2006). Judicial review is available

in cases in which the Attorney General denies relief. 18 U.S.C. § 925(c).

On appeal, Holt argues that two of 922(g)(4)'s necessary elements—that of commitment and possession—were not established and were not properly charged to the jury. We address each contention in turn.

## A. Commitment

In Maine, under the current statute (which was in effect when Holt was ordered admitted to a mental hospital), a person can be involuntarily admitted to a mental hospital on an emergency basis. Under Maine's emergency admission statute, to initiate such an admission, "[a]ny health officer, law enforcement officer or other person," must make a written application which states his "belief that the person [who would be admitted] is mentally ill and, because of his illness, poses a likelihood of serious harm." 34-B M.R.S.A. § 3863(1) (2004). This application must be accompanied by a certificate of examination signed by a "licensed physician, physician's assistant, certified psychiatric clinical nurse specialist, nurse practitioner or a licensed clinical psychologist," stating that the person to be admitted is "mentally ill" and, as a result, "poses a likelihood of serious harm." 34-B M.R.S.A. § 3863(2). A judicial officer then reviews the application and medical certificate. 34-B M.R.S.A. § 3863(3). If the judicial officer finds that the documents are "regular and in

-7-

accordance with the law, the judge...shall endorse them," at which point the subject of the application may be transported to a hospital. Id.

After a person has been involuntarily admitted to a hospital under this process, he must be examined by a "staff physician or licensed clinical psychologist" within 24 hours. 34-B M.R.S.A. § 3863(7)(C). If an examination does not take place within 24 hours, or the examiner refuses to certify that the person is mentally ill and as a result poses a likelihood of serious harm, the person is immediately discharged. Id. If the examiner certifies that the person poses a likelihood of serious harm as a result of his mental illness, then the person may choose to be informally admitted, or the chief administrator of the hospital can seek "involuntary commitment" of the person within five days from the initial admission under 34-B M.R.S.A. § 3864. 34-B M.R.S.A. § 3863(5)(B). Thus, in contrast to the initial admission certification, which may be made by persons who are not licensed psychologists or physicians, the certification required after the 24-hour examination must be made by a licensed psychologist or physician.

In United States v. Chamberlain, 159 F.3d 656 (1st Cir. 1998), this court considered whether a person involuntarily admitted to a hospital under 34-B M.R.S.A. § 3863 has been "committed to a mental institution" for purposes of 18 U.S.C. §

922(g). Under the Maine statute then in effect, a certification by a licensed psychologist or physician was required both for initial admission and after the 24-hour examination. Chamberlain, 159 F.3d at 666-67. In Chamberlain, an initial application for involuntary admission had been made, was certified by a licensed physician, and endorsed by a judge. Id. at 657. The defendant was then admitted to a hospital and was examined by a physician within 24 hours who certified that the defendant posed a likelihood of serious harm as result of a mental illness. Id. After the initial five-day emergency admission, the defendant voluntarily admitted himself to the hospital and, therefore, the chief administrator of the hospital did not seek an "involuntary commitment" order under 34-B M.R.S.A. § 3864. Id. The defendant argued that a person cannot be deemed "committed" until after the defendant has a full hearing. Essentially, the defendant argued that no "commitment" can occur unless a final involuntary commitment order is secured under 34-B M.R.S.A. § 3864. Id. at 661.

The court noted that Congress aimed broadly in the Gun Control Act and Congress believed that "the mere risk or potential for violence" was a "sufficient reason to prohibit certain categories of persons from possessing firearms." Id. at 660. In light of these objectives, the court held that the five-day detention was a "commitment," concluding that the substance of the mental institute admission procedures, rather than the label of the

-9-

procedures as a "commitment," is controlling for the federal statute.  Id. at 663, 665.  The court thus parted ways with the Fifth and Eighth circuits, which had allowed the state legislature's labeling of an emergency admission as a "commitment" to control for federal purposes.  Id. at 662.

There have been no subsequent developments that would suggest that Chamberlain was wrongly decided, and we are obligated to follow it in any event.  There are, however, two differences between this case and Chamberlain.  First, there is a factual difference.  In Chamberlain, the patient was admitted to a mental institute and examined within 24 hours, but here the record does not reveal whether a 24-hour examination occurred.  We do not think that the existence of a 24-hour examination makes a difference in the outcome, nor did Chamberlain suggest that it should.  As the Chamberlain court noted, at the time the judicial order was issued, and before the second examination had occurred, Chamberlain was ordered "detained in a mental institution for five days" based on a judicial order that this was in accordance with law.  Id. at 663.  This process meets the ordinary definition of "commitment" embraced in Chamberlain: "to place in or send officially to confinement...to consign legally to a mental institution...."[1]  Id. at 661 (quoting

_____

[1]     To the same effect, Webster's Third New International Dictionary 457 (1966) defines "commit" as "to consign legally to a mental institution" and Black's Law Dictionary 341 (4th ed. 1957) defines "commit" as "[t]o send a person . . . to an asylum, workhouse, reformatory, or the like, by authority of a court or

-10-

Webster's Third New Int'l Dictionary (1971)). We conclude that the term "committed" in the statute refers to a judicial (or possibly an administrative) order of commitment and does not depend on the ultimate outcome of the commitment. See also United States v. Vertz, 40 Fed. Appx. 69, 73, 2002 WL 1359368 (6th Cir. 2002) (unpublished) (finding a defendant "committed" where a petition was filed by a psychiatrist in probate court but the required 24-hour follow-up psychiatrist examination did not occur).[2]

Thus, a commitment under the Maine statute occurs when the court orders an involuntary hospitalization and not when the licensed psychologist or physician determines that the individual should remain in the institution after the 24-hour examination, and Chamberlain is not distinguishable based on the existence in that case of a 24-hour examination.[3]

---

magistrate."

[2] There is some indication in the legislative history that an administrative order may satisfy the commitment requirement. See H.R. Rep. No. 90-1956 (1968) (Conf. Rep.), reprinted in 1968 U.S.C.C.A.N. 4430 ("[I]n the case of mental defectives and committed persons [the conference substitute] does not require that there be prior action by a court inasmuch as mental boards and commissions constitute the adjudicating or committing authority in some jurisdictions.").

[3] The appellant also argues that the trial court improperly shifted the burden to prove "commitment" by only requiring the prosecution to prove the judicial order, thereby forcing the defense to prove the lack of a 24-hour examination. Since we interpret a "commitment" to occur with the issuance of a judicial order, the appellant's argument is necessarily rejected.

-11-

The second difference between this case and <u>Chamberlain</u> involves the amendment of the Maine statute to permit an initial commitment to be based on a certification of a physician's assistant, a certified psychiatric clinical nurse specialist, or a nurse practitioner in addition to a certification by a licensed psychologist or physician. 34-B. M.R.S.A. § 3863(2). We need not reach the question whether a judicial order for admission based, for example, on a certification by a physician's assistant would constitute a commitment under the federal statute or, indeed, whether such a court-ordered admission would satisfy due process requirements (a condition, we may assume, of a commitment under the federal statute). Here, as in <u>Chamberlain</u>, the initial order was based on a physicians's certificate. <u>See</u> <u>Parham</u> v. <u>J.R.</u>, 442 U.S. 584 (1979) (holding due process for commitment of a minor is satisfied if a physician evaluates the patient's medical and emotional condition); <u>see also</u> <u>Addington</u> v. <u>Texas</u>, 441 U.S. 418, 429 (1979) ("Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." (emphasis omitted)).

There is therefore no merit to appellant's arguments that the element of commitment was not properly charged to the jury and that he was not committed within the meaning of the federal statute.

-12-

## B. Possession

In the alternative, Holt argues that the district court erred by refusing to give the jury two instructions he requested on possession.

We first consider Holt's request for an instruction on the intent required for possession. Specifically, Holt asked the court to instruct the jury that "[i]ntent is necessary to possession, and the requisite intent is to exercise authority, dominion or control." Appellant's Br. at 24. Instead, the district court instructed the jury in part that:

> The term "possess" means to exercise authority, dominion or control over something . . . . The word "knowingly" means that the possession was voluntary and intentional, not because of mistake or accident.

Trial Transcript at 237-238.

Since both instructions included language on "authority, dominion and control" and stated that possession must be intentional, we see no material difference between them. Thus, the court did not err in refusing Holt's instruction.

Holt next contends that the court improperly refused to include the underscored language in the jury charge: "[a]n act is done knowingly if it is done voluntarily and intentionally, and not because of mistake or accident or for some other innocent reason." Appellant's Br. at 24 (emphasis added). In other words, appellant objects to exclusion of the "some other innocent reason" language.

-13-

This court has recently addressed a related issue in United States v. Teemer, 394 F.3d 59 (1st Cir. 2005). There, the defendant was found in a car in proximity to a gun. The defendant told police officers that he had previously touched the gun when he moved it from a seat so that he could sit down. Id. at 61. The defendant complained that the district court had refused to give an instruction that would have barred conviction for "fleeting" or "transitory" possession. Id. at 62. The court held that the "fleeting" and "transitory" possession instruction was "overbroad" and would be a recipe for misuse. Id. at 63-64.

Holt correctly points out that the instructions that were actually given in Teemer included the language the appellant requested here, stating that "[a]n act is done knowingly if it is done voluntarily and intentionally and not because of a mistake or accident or some other innocent reason." 394 F.3d at 68 (emphasis added). However, the court in Teemer did not approve this language, although it was quoted in an appendix to the opinion. Id. Furthermore, the court explicitly disfavored requiring such language when combined with a "fleeting" or "transitory" possession instruction, rejecting the District of Columbia Circuit's approach in United States v. Mason, 233 F.3d 619 (D.C. Cir. 2000). Id. at 64. The court in Teemer feared that an instruction "combining requirements of innocent acquisition and brevity of retention[] could be misused" given that the statute did not "leave much room

-14-

for benign transitory possession."  Id.  We think this same potential for misuse could exist if we required an "innocent possession" instruction stripped of the reference to "transitory" or "fleeting" possession.  This court, albeit in dicta, has already read Teemer as declining "to adopt this innocent possession defense...." United States v. Mercado, 412 F.3d 243, 252 (1st Cir. 2005).  We decline to require that the district court's instruction include "innocent" possession as a defense.

Conceivably, extraordinary cases might arise where voluntary possession would exist in a literal sense and yet Congress could not have intended the statute to apply.  We imagine the felon who snatches a loaded gun out of the hand of a five year old, or the felon who wrestles a gun from an armed intruder, and promptly surrenders possession after the intervention.  In such a case, if the government were foolish enough to prosecute, some caveat might indeed be needed (e.g., an instruction on a necessity or justification defense.)[4]  But nothing like that is present in this case.  There were no exigent circumstances alleged here that required Holt to personally retrieve the gun from the truck.

---

[4]  See United States v. Singleton, 902 F.2d 471, 472 (6th Cir. 1990); United States v. Holliday, 457 F.3d 121, 127 (1st Cir. 2006) (noting that the First Circuit has appeared to assume that justification defenses might be available).

-15-

**III.**

For the reasons stated above, the district court's decision is affirmed.

It is so ordered.