# United States Court of Appeals
## For the First Circuit

No. 12-1565

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFREY BAIRD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Howard, Stahl and Thompson,

Circuit Judges.

Michael B. Whipple, by appointment of the court, with whom Hallett Whipple, P.A. was on brief for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief for appellee.

April 5, 2013

**STAHL, Circuit Judge.** On September 3, 2008, Jeffrey Baird purchased a stolen handgun from Michael Hatch. Two days later, Baird returned the gun to Hatch in exchange for the money he had paid. Based on the brief time he possessed the weapon, Baird was indicted and convicted of one count of possession of a stolen firearm under 18 U.S.C. § 922(j) (2006). He was sentenced to a $100 special assessment, a jail term of one month, and a two year term of supervised release that he is still serving. Baird appeals his conviction, arguing that the district court erred when it refused to give the jury an instruction he requested, which would have allowed him to make out a defense of "innocent possession" of the stolen weapon. Because we believe that Baird was entitled to an innocent possession instruction, we vacate his conviction and remand the case for a new trial.

## I. Facts & Background

This story begins on August 27, 2008, when Hatch and another man burglarized the Pine Tree Trading pawnshop in Lewiston, Maine, and stole 14 firearms from the store. Hatch was Baird's next-door neighbor and lifelong friend. Baird did not own a gun, but he learned from Hatch, a weapons collector, how to shoot and handle one safely. At the time, Hatch had no criminal record, and Baird had no idea that Hatch was involved in a burglary.

On September 3, Baird went to Hatch's house to visit. Here, the various accounts of the story begin to diverge.

According to Baird, the two started talking about guns. Hatch went up to his bedroom, where he kept a weapons collection on display that included a hunting rifle, a shotgun, and a handgun, as well as knives, swords, tomahawks, and the like. Baird followed behind him. When Baird entered the room, he saw that Hatch had laid out several guns on top of his bed. Baird also noticed a black canvas bag lying on the floor next to the bed. Hatch offered to sell Baird one of the weapons, and Baird, without an inkling that the guns had been stolen, agreed to pay $200 for a .45 caliber Smith & Wesson pistol -- $100 immediately and $100 the next week. Baird took the weapon and headed home.

Hatch tells a different story. In Hatch's version, Baird entered the bedroom with him. Baird watched as Hatch reached behind a drawer in the wall of the room where he had hidden a black canvas bag containing the guns that he had stolen from the pawnshop. Baird also watched as Hatch removed several of the guns from the bag and placed them on top of his bed. Hatch then told Baird that the guns were "hot," which is a slang term for "stolen." Baird examined the weapons, and Hatch offered to sell him a .45 caliber Smith & Wesson pistol. They bargained over the price, and eventually agreed on $200, with half to be paid immediately and the rest later. At trial, Hatch added that he had never before attempted to sell Baird a gun, and that Baird should have known

that Hatch could not have afforded to buy the guns that he showed him.

The stories continue to differ about what happened the day after the sale, on September 4. According to Baird, he purchased bullets for the gun at a Wal-Mart and then went shooting with it in the afternoon. Afterward, he went to his friend Jason Trahan's house to show off his new acquisition. But Baird's pride turned to distress when Trahan warned him that it was unwise to buy a firearm in a private sale without getting more information about its provenance. Baird returned home worried about what he should do with the pistol, but he still did not suspect that it had been stolen. At trial, Trahan corroborated this story, although he admitted on cross-examination that he could not be sure about whether the conversation took place on September 3 or September 4.

In Hatch's version, he met with Baird a second time a "few days" after he sold him the pistol. Hatch specifically stated that this meeting with Baird did not occur the day after the sale, which would have been September 4. However, Hatch's story only makes sense in relation to the other events in the case if the encounter did take place on September 4.[1] In any event, Hatch

_____

[1]There are three critical dates in this case: (1) September 3, the day that Hatch sold Baird the gun, (2) September 4, the day of the alleged Trahan/Baird and Hatch/Baird meetings, and (3) September 5, the day that Baird returned the gun to Hatch. If, as seems evident from Hatch's testimony, his alleged second meeting with Baird took place on a different date than the return of the gun, then the only other date on which it could have occurred is

-4-

claims that he met with Baird, and that Baird told him that he had purchased ammunition for the pistol at a Wal-Mart earlier in the day and then taken it shooting. Hatch related that he became upset with Baird, and reminded him that the gun was stolen and that it should not be used in public. He asked Baird to give him back the gun in exchange for the money he had paid, and Baird agreed to return the weapon, though he did not do so at that time. At trial, Bureau of Alcohol, Tobacco, Firearms, and Explosives Agent Christopher Durkin, who interviewed Baird about the burglary on October 29, 2008, claimed that Baird had confirmed to him that this encounter with Hatch took place, although Durkin did not tape or take any notes recording the interview. In his trial testimony, Baird denied that this meeting with Hatch ever occurred, and explained that he only told Durkin that it had because he had confused it with his conversation with Trahan on that same day.

The events of the last relevant date in the case, September 5, are no clearer. Baird claims that he went to Hatch's house in the afternoon. He told Hatch that he had purchased ammunition for the pistol and taken it shooting. Hatch grew angry with him, and informed him for the first time that the gun was stolen. Baird, who had the gun with him, immediately returned the weapon to Hatch in exchange for his money. According to Hatch's

---

September 4.

-5-

account, Baird simply came to his house with the pistol and gave it to him in return for the money he had paid.

Now the storylines merge. Later on the same day that Baird returned the gun to Hatch, Baird was interviewed by an officer from the Lewiston Police Department investigating the Pine Tree Trading burglary. Baird admitted to having briefly possessed a stolen gun, but said that he had sold it back to the person from whom he had purchased it. He fabricated several different stories of how he had obtained the gun, and when the police expressed skepticism, he declared that he would not say where he had bought the weapon because he did not want to get his friend in trouble. Ultimately, however, he admitted that he bought the gun from Hatch. The police searched Baird's home but did not find any firearms inside. Next, the police interviewed Hatch about the burglary. Hatch immediately showed the police the stolen guns that he had squirreled away in his bedroom wall, including the .45 Smith & Wesson pistol that he had briefly sold to Baird. Hatch initially lied to the police about how he had obtained the guns, but eventually he confessed to the burglary.

On July 13, 2011, Baird was indicted on one count of possession of a stolen firearm under 18 U.S.C. § 922(j), based on the short time that he spent in possession of the pistol. At the close of testimony, Baird requested that the court include the

following instruction in its charge to the jury, which would allow him to raise an "innocent possession" defense:

> Briefness of contact alone does not preclude a finding of possession. But if you find that Jeffery Baird did not know or have reason to know that the firearm was stolen when he first possessed it and that as soon as he learned or had reason to know that it was stolen he took adequate steps to [get] rid of [it] as promptly as reasonably possible, then you may find that he did not knowingly possess a firearm.

However, the district court declined to give this instruction. The court analogized the situation to felon-in-possession cases, in which our circuit has rejected such a defense, see United States v. Teemer, 394 F.3d 59 (1st Cir. 2005), and to possession-of-stolen-property cases, in which courts have discussed the obligation that innocent acquirers have to return stolen property to its rightful owners, see Godwin v. United States, 687 F.2d 585 (2d Cir. 1982); Commonwealth v. Kelly, 446 A.2d 941 (Pa. 1982); Williams v. Superior Court, 81 Cal. App. 3d 330 (1978). The district court also noted that the one circuit court decision to address the availability of such a defense in a possession-of-a-stolen-firearm case seemed to reject it. See United States v. Al-Rekabi, 454 F.3d 1113 (10th Cir. 2006). Finally, the court emphasized that Baird had admitted to having learned that the gun was stolen the night before he returned the weapon,[2] and that the government had

---

[2]The district court appears to have been mistaken on this point. Baird testified that Trahan warned him on September 4 that

-7-

promised not to argue that Baird was guilty the moment he learned the gun was stolen. However, the court did borrow the first sentence from Baird's suggested instruction, telling the jury that "Briefness of contact alone does not preclude a finding of possession." Baird objected to the inclusion of this single phrase standing alone, but the court was unmoved.

In its final instructions to the jury, the court explained that the government had to prove three elements beyond a reasonable doubt: (1) that Baird "knowingly possessed the firearm described in the indictment"; (2) that "at the time . . . Baird possessed the firearm, the firearm was stolen and . . . Baird knew or had reasonable cause to believe that the firearm was stolen"; and (3) that the firearm had been transported in interstate commerce.[3] The court defined "knowingly" as "done voluntarily and intentionally, not because of mistake or accident," and defined "possess" as the "exercise [of] authority, dominion, or control over something." The court also gave the "briefness of contact" instruction described above.

_____

he should have been more careful about buying the gun, but affirmed that he had no idea the weapon was stolen until September 5, upon which he immediately returned it to Hatch.

[3]Cf. 18 U.S.C. § 922(j) ("It shall be unlawful for any person to . . . possess . . . any stolen firearm . . . which has been shipped or transported in interstate or foreign commerce . . . knowing or having reasonable cause to believe that the firearm or ammunition was stolen.").

-8-

During jury deliberations, the jury addressed the following question to the court: "Is a person guilty as soon as he/she had a reasonable cause to believe a firearm in their possession is stolen?" The parties jointly agreed that the court should respond to the question as follows: "the Government is not arguing that a person is guilty as soon as he/she had a reasonable cause to believe a firearm in their possession is stolen." The jury returned a guilty verdict later that same day. Baird now appeals his conviction, arguing that the court should have given the jury the "innocent possession" instruction that he requested.

## II. Analysis

A criminal defendant is entitled to an instruction on his theory of defense so long as the theory is legally sound and supported by evidence in the record. See United States v. Powers, 702 F.3d 1, 8-9 (1st Cir. 2012). When a district court decides whether to give a requested instruction, it must take the evidence in the light most favorable to the defendant, without making credibility determinations or weighing conflicting evidence. Id. at 9. The standard for "plausibility" is quite low. Id.; see also United States v. Johnson, 459 F.3d 990, 993 (9th Cir. 2006).

Our circuit's precedent reveals some confusion regarding the proper appellate standard of review in a case like this one, where the defendant has preserved an objection to the district court's refusal to give his requested jury instruction. Most of

-9-

our decisions describe our review as de novo in such cases, see, e.g., Powers, 702 F.3d at 8-9; United States v. Earle, 488 F.3d 537, 546 (1st Cir. 2007); United States v. Buttrick, 432 F.3d 373, 376 (1st Cir. 2005); United States v. Mercado, 412 F.3d 243, 251 (1st Cir. 2005), but some say that we review for abuse of discretion, see, e.g., United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008); United States v. Otero-Méndez, 273 F.3d 46, 55 (1st Cir. 2001); United States v. Lewis, 40 F.3d 1325, 1336 (1st Cir. 1994). A few other decisions do not state any standard of review at all. See, e.g., United States v. Marino, 277 F.3d 11, 35 (1st Cir. 2002); United States v. Gabriele, 63 F.3d 61, 68 (1st Cir. 1995).

We hope to provide some clarity here. To successfully challenge a district court's decision not to give a requested instruction, the defendant first "must present sufficient evidence to be entitled to [the] instruction." United States v. Callipari, 368 F.3d 22, 32 (1st Cir. 2004), vacated on other grounds, Callipari v. United States, 543 U.S. 1098 (2005). This is the same threshold that the defendant must meet when he makes his initial request of the district court. See Powers, 702 F.3d at 8-9. Because this determination "entails not differential fact-finding, but merely an inquiry into the legal sufficiency of the evidence, the standard of appellate review . . . should be plenary." United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988); see also

United States v. Lopez-Lopez, 282 F.3d 1, 18 (1st Cir. 2002). Therefore, "[w]e review de novo the sufficiency of the evidence supporting the proposed instruction." Callipari, 368 F.3d at 32. Like the district court, "[w]e 'examine the evidence on the record and . . . draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can plausibly support the theory of the defense." Id. (quoting United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998)).

If we determine on our de novo review that the evidence at trial, taken in the defendant's favor, was sufficient to support his requested instruction, then we move to a three-part test to decide whether the district court's refusal to give the instruction constitutes reversible error. See id. We will reverse a district court's decision to deny the instruction only if the instruction was (1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense. See id.; see also Mercado, 412 F.3d at 251; United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997). Each step in this three-part test involves a question of law, which we decide de novo. See, e.g., United States v. Venti, 687 F.3d 501, 504 (1st Cir. 2012).

To the extent that our past cases on this matter suggest otherwise, we believe the difference is likely due to inadvertent conflation of the de novo standard for a court's refusal to give an instruction with the abuse of discretion standard for a court's phrasing of an instruction. See Gray, 289 F.3d at 133 (explaining that claims of instructional error are either "reviewed de novo (e.g., failure to give an instruction) or under an abuse of discretion standard (e.g., court's choice of language)"); see also Wilson v. Maritime Overseas Corp., 150 F.3d 1, 10 & n.7 (1st Cir. 1998). Our precedent is iron-clad on the application of de novo review to the threshold issue of whether the evidence was sufficient to support the instruction, see Rodriguez, 858 F.2d at 812, although we differ from some other circuits on this matter, see, e.g., United States v. Bush, 626 F.3d 527, 538-39 (9th Cir. 2010). And it would make no sense to apply abuse of discretion review to the legal questions implicated by the three-part test that follows the sufficiency of the evidence determination.

Therefore, we begin with the question of whether the evidence at trial, taken in the light most favorable to Baird, plausibly supported his requested "innocent possession" instruction. According to Baird, he purchased the pistol from Hatch on September 3 under circumstances in which he did not know or have reason to know that the gun was stolen. He grew concerned about the propriety of the sale after speaking to Trahan on

-12-

September 4, but he did not learn that the pistol had been stolen until Hatch told him so on September 5, upon which he immediately returned the weapon. This evidence provided ample support for Baird's requested instruction, which would have told the jury that it could acquit him if it found that he bought the gun without knowledge that it was stolen and that he disposed of the weapon as soon as reasonably possible after learning the truth. When the district court considered Baird's request for an innocent possession instruction, it based its decision on the mistaken recollection that Baird had admitted to knowing that the gun was stolen the night before he returned it. Perhaps if the district court had recalled more accurately the record of the evidence provided by Baird at trial, it would have been more amenable to his proposed instruction.

Moving onto the three-part test, we ask first whether Baird's requested "innocent possession" instruction was correct as a matter of substantive law. The statute under which Baird was convicted, 18 U.S.C. § 922(j), makes it a crime to receive or possess a stolen firearm that has moved in interstate commerce "knowing or having reasonable cause to believe that the firearm . . . was stolen." Id. It is common ground between the parties that § 992(j) includes the scenario in which someone receives a weapon without knowledge that it is stolen, and upon discovering that it

-13-

is stolen continues to retain it.[4]  And although § 922(j) itself is silent on the matter, it is also apparently common ground that the statute must permit some kind of "innocent possession" defense, because, as the government observes in its brief, "Congress would likely not have intended absurd results that would allow conviction of truly innocent possessors of stolen firearms."  Brief for Appellee United States of America at 32 (No. 12-1565); cf. United States v. Holt, 464 F.3d 101, 107 (1st Cir. 2006), overruled on other grounds, United States v. Rehlander, 666 F.3d 45 (1st Cir. 2012); Teemer, 394 F.3d at 64.  The question in this case, then, is the scope of the "innocent possession" defense available under § 922(j), and whether it covers Baird's unfortunate tale.

Without fully defining the scope of the § 922(j) innocent possession defense, we are persuaded that it at least should have been made available to Baird in this case.  When the district court weighed Baird's request for the innocent possession instruction, it observed correctly that our decision in Teemer, 394 F.3d 59, disapproved of a mandatory innocent possession defense for 18 U.S.C. § 922(g)(1) felon-in-possession cases.  See id. at 64-65; see also Holt, 464 F.3d at 107 (same for 18 U.S.C. § 922(g)(4)

---

[4]Cf. American Law Institute, Model Penal Code & Commentaries § 233.6 at 235 (1980) ("By defining 'receiving' to include the retention of possession, the Model Code also makes it possible to convict a person who receives without knowledge that the goods were stolen but who, upon learning of their status, nevertheless resolves to keep or sell them.").

-14-

possession of a firearm by a person who has been committed to a mental institution cases).  But that is not all Teemer said.  While Teemer declined to create a "mandatory safe harbor" for innocent possession, it also acknowledged that "there are circumstances that arguably come within the letter of the law but in which conviction would be unjust," such as if a felon snatched away a loaded gun from his school-aged son and then called the police to retrieve it. Teemer, 394 F.3d at 64.  Therefore, although Teemer relied primarily on prosecutorial discretion and the common sense of the jury to weed out the cases warranting leniency in § 922(g) cases, we have simultaneously recognized that "extraordinary cases might arise where . . . . if the government were foolish enough to prosecute, some caveat might indeed be needed (e.g., an instruction on a necessity or justification defense.)" Holt, 464 F.3d at 107; see also Teemer, 394 F.3d at 64 ("Most prosecutors and--failing that--most juries would show good sense in such situations.  But sometimes both safeguards fail.").

We believe that a defendant prosecuted under § 922(j) should at least receive the minimal protection afforded by Teemer and its progeny.  As Teemer recognized, the "problem of allegedly innocent possession recurs intermittently" in cases where guilt hinges on the defendant's possession of some item, as it does for a possession-of-a-stolen-firearm prosecution under § 922(j). Teemer, 394 F.3d at 64 (citing United States v. Mason, 233 F.3d

-15-

619, 622-24 (D.C. Cir. 2000)); United States v. Kitchen, 57 F.3d 516, 521-25 (7th Cir. 1995)). Although federal criminal law permits common law "justification" defenses such as necessity and duress, neither defense can provide a perfect shield for every truly innocent possessor, nor can legislatures "draft a generally framed statute that anticipates every untoward application and plausible exception." Teemer, 394 F.3d at 64. Therefore, like the felon-in-possession statute, the possession-of-a-stolen-firearm provision will inevitably contain gaps that allow the occasional "extraordinary case" to slip through, "where voluntary possession would exist in a literal sense and yet Congress could not have intended the statute to apply." Holt, 464 F.3d at 107.

Indeed, the danger that someone might innocently violate the law is much greater for § 922(j) than it is for § 922(g)(1). The felon-in-possession provision aims "broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous. These persons are comprehensively barred . . . from acquiring firearms by any means." Barrett v. United States, 423 U.S. 212, 218 (1976). While it is possible to conceive of a truly benign circumstance in which a felon could come into possession of a firearm--for instance, the example of the father mentioned above--those cases should be few and far between. Accordingly, "[t]he innocent possession defense to a § 922(g)(1) charge is necessarily narrow." Mason, 233 F.3d at 624.

-16-

Not so for a § 922(j) charge. Intra-state gun sales between private parties are entirely legal under federal law, see 18 U.S.C. §§ 922(a)(3) & (a)(5), 922(d); 27 C.F.R. 478.29 & 478.30, and every time someone participates in a private sale, he runs the risk of unwittingly purchasing a stolen weapon. While there are few situations in which a felon could innocently procure a firearm, there are many in which a law-abiding gun owner could inadvertently come into possession of a stolen weapon. Just as it was "unthinkable" to the Supreme Court "that Congress intended to subject . . . law-abiding, well-intentioned citizens to a possible ten-year term of imprisonment if . . . what they genuinely and reasonably believed was a conventional semi-automatic [weapon] turns out to . . . be a fully automatic weapon," it is equally unthinkable to us that Congress intended to subject law-abiding, well-intentioned citizens to a possible ten-year term of imprisonment if what they genuinely and reasonably believed was a legally acquired gun turned out to be stolen. Staples v. United States, 511 U.S. 600, 615 (1994) (quoting United States v. Anderson, 885 F.2d 1248, 1254 (5th Cir. 1989) (en banc)); see also 18 U.S.C. § 924(a)(2) (up to ten-year sentence for violation of § 922(j)). Therefore, at the very least, defendants prosecuted under § 922(j) should have the same opportunity to raise an innocent possession defense as those charged under § 922(g)(1). Whether the higher likelihood of truly innocent possession under § 922(j)

-17-

should correspond to a broader innocent possession defense in such cases is a question we reserve for a later decision.[5]  Here, we hold only that defendants prosecuted under § 922(j) must receive, at minimum, the innocent possession defense afforded by Teemer.

The district court relied in part on the Tenth Circuit's decision in Al-Rekabi, 454 F.3d 1113, to conclude that Baird was not entitled to his requested instruction.  Al-Rekabi is the only decision of which we are aware that has come close to addressing this issue through its discussion of the related, "fleeting possession" defense under § 922(j), which it ultimately rejected. However, its conclusion does not compel us to reach a similar result here.  First, Al-Rekabi affirmed the denial of the fleeting possession instruction because it believed it to be "redundant to the necessity defense," which the defendant in that case had failed to establish.  See id. at 1126-27.  However, the innocent

_____

[5]Baird urges us to follow the lead of the D.C. Circuit in United States v. Mason, 233 F.3d 619, 623 (D.C. Cir. 2000), which held that a defendant prosecuted under 922(g)(1) is entitled to an innocent possession instruction so long as he can establish that "(1) the firearm was attained innocently and held with no illicit purpose and (2) possession of the firearm was transitory." Id. at 624.  Our circuit has declined to adopt the Mason approach in § 922(g) cases, see United States v. Leahy, 473 F.3d 401, 406 n.3 (1st Cir. 2007); United States v. Holt, 464 F.3d 101, 107 (1st Cir. 2006); United States v. Mercado, 412 F.3d 243, 252 (1st Cir. 2005); United States v. Teemer, 394 F.3d 59, 64-65 (1st Cir. 2005), but there may be good reason to take a different tack in § 922(j) prosecutions.  Nevertheless, because we find that Teemer's case-specific approach alone requires an innocent possession instruction here, we need not reach the broader question of whether a § 922(j) defendant might in all cases be entitled to a mandatory innocent possession instruction like the one described in Mason.

possession defense described by <u>Teemer</u> is specifically tailored to cases where a necessity justification would not be available to the defendant, <u>see</u> <u>Teemer</u>, 394 F.3d at 64, and so <u>Al-Rekabi</u>'s reason for rejecting the defense is not relevant here. Second, <u>Al-Rekabi</u> involved a situation in which the defendant did not dispute that he had obtained possession of the stolen weapon with knowledge that it had been stolen, <u>see</u> <u>Al-Rekabi</u>, 454 F.3d at 1117-18, while Baird claims he discovered that the pistol was stolen only after he had purchased it. Therefore, we hesitate to impose the same onerous requirements on Baird that the Tenth Circuit did on Al-Rekabi. <u>See</u> <u>id.</u> at 1123.

Applying the <u>Teemer</u> rule to Baird's request for an innocent possession instruction, we ask whether his was an "extraordinary case[] . . . [in which] Congress could not have intended the statute to apply." <u>Holt</u>, 464 F.3d at 107; <u>see also</u> <u>Teemer</u>, 394 F.3d at 65. We believe that Baird's is just such a case. Baird says that he had only momentary possession of the pistol with knowledge that it was stolen before he quickly handed it back to Hatch. This story fits precisely into the mold of the examples given in <u>Teemer</u>, where the elements of a crime are technically satisfied for a brief interlude and yet where the circumstances are such that conviction would be unjust.[6]

---

[6]<u>Cf.</u> <u>Teemer</u>, 394 F.3d at 64 ("Consider if a schoolboy came home with a loaded gun and his ex-felon father took it from him, put it in [a] drawer, and called the police; or if a mother--who

-19-

We do not believe that Congress would have intended §
922(j) to brand Baird a felon under these circumstances. Like
other receipt-of-stolen-property offenses, § 922(j) aims to
discourage theft by punishing the "fences" who purchase stolen
property. See American Law Institute, Model Penal Code &
Commentaries § 233.6 at 232 (1980). That goal is met if a "fence"
unwittingly buys stolen property and then immediately returns it to
the seller upon learning its true source, since it forces the thief
to disgorge his profit. If Baird's story is true, then it is hard
to imagine what additional purpose is achieved by punishing him
after he returned the weapon. It could be that § 922(j) serves to
get stolen guns off the streets by requiring those who come into
their possession to immediately contact the police or the weapons'
true owners, but the provision itself contains no such duty, and we
hesitate to impose that responsibility in the absence of any
indication that one was intended. The other possibility is that
the provision is meant to impose a rigid obligation that buyers in
private gun sales must confirm with certainty that the seller is
the weapon's lawful owner or risk a felony; however, as we
explained above, we do not believe Congress intended to create this
requirement.

need not be a felon to be charged with drug possession--threw into
the trash an envelope of marijuana found in her daughter's bureau
drawer.").

The government argues that no innocent possession defense should be available in this case as a matter of law because Baird failed to deliver the pistol either to the police, see Mason, 233 F.3d at 624; United States v. Hendricks, 319 F.3d 993, 1007 (7th Cir. 2003), or to its true owner, see Godwin, 687 F.2d at 588; Model Penal Code & Commentaries § 223.6(1) at 231. That requirement is absent both from the language of the statute and from Teemer and its progeny. Indeed, it is even absent from some of the cases on which the government asks us to rely. While § 922(g) cases do seem to require that defendants attempt to return weapons in their possession to the police, possession-of-stolen-goods cases merely recognize that defendants may raise a defense if they purchase property knowing that it is stolen but "with the purpose of restoring [the] stolen property to the [true] owner." Godwin, 687 F.2d at 588; see also United States v. Calkins, 906 F.2d 1240, 1246-47 (8th Cir. 1990). By acknowledging such a defense, this latter group of cases does not exclude an innocent possession defense in Baird's case, especially since he did not possess the stolen weapon with any "purpose" at all--according to his story, he only learned that the gun had been stolen after he bought it.[7] And while it is true that the D.C. Circuit has

---

[7]Neither Commonwealth v. Kelly, 300 Pa. Super. 451 (1982) nor Williams v. Superior Court, 81 Cal. App. 3d 330 (1978) are to the contrary. Kelly addressed the question of whether a person could commit the crime of theft by acquiring property innocently and then continuing to retain possession after learning that the property

-21-

required defendants in § 922(g)(1) cases to attempt to return the guns in their possession to the police in order to receive an innocent possession instruction, Mason, 233 F.3d at 624, Teemer's more case-specific approach permits consideration of this factor but does not call for a general rule.[8]  Finally, given the higher likelihood of truly innocent possession under § 922(j) than under § 922(g)(1), we prefer not to impose a duty on innocent buyers of stolen firearms that would subject them to criminal liability unless they immediately turned the seller over to law enforcement.

The second point we must address is whether the innocent possession instruction, though denied, was nevertheless substantially incorporated elsewhere in the charge as rendered. See Mercado, 412 F.3d at 251.  We do not believe that the district

---

was stolen--an issue on which the parties here are in agreement. See Kelly, 300 Pa. Super. at 453.  Kelly's reference to a defendant's duty to restore stolen property to its true owner comes from the language of the state theft statute itself, a factor not present in this case.  See id. at 454 (citing 18 Pa. S.C.A. § 3925 (1972)).  In Williams, the court recognized "a continuing affirmative duty to restore [stolen] property to its rightful owner," but only in the context of "one who receives stolen property for his own personal use" and continues to possess it after learning that it was stolen.  Williams, 81 Cal. App. 3d at 344.  The Williams court stated expressly that the "personal obligation to return [stolen] property to its rightful owner terminates upon . . . divesting [oneself] of possession," which Baird did here by returning the pistol to Hatch in exchange for the money he had paid.  Id.

[8]Indeed, one of Teemer's examples of an extraordinary circumstance meriting an innocent possession instruction was a mother who discovered marijuana in her daughter's drawer and threw it away, rather than turning it over to the police.  Teemer, 394 F.3d at 64.

court's instructions in this case incorporated an innocent possession defense. The court told the jury that it could convict Baird if it found that he "knowingly possessed the firearm" at the same time that he "knew or had reasonable cause to believe that the firearm was stolen." This instruction, paired with the district court's admonition that "[b]riefness of contact alone does not preclude a finding of possession," entirely foreclosed Baird's innocent possession defense.

The court went some way toward incorporating the requested instruction through its response to the jury's question during deliberations, explaining that "the Government is not arguing that a person is guilty as soon as he/she had a reasonable cause to believe a firearm in their possession is stolen." However, this answer did not do enough to inform the jury that it could acquit Baird if it believed that he only possessed the gun for a few moments with knowledge that it was stolen. First, the negative phrasing of the answer and its focus on the substance of the prosecution's argument rather than what was required for a finding of guilt may well have left the jury confused about whether it still had to convict Baird on that theory even though the government was "not arguing" it. Second, while not absolutely contradictory, the answer is nevertheless difficult to reconcile with the court's earlier "briefness of contact" instruction. In these circumstances, we cannot know for sure that the jury did not

-23-

still feel bound by the earlier instruction to convict Baird based on his version of the events. Cf. United States v. DeMasi, 40 F.3d 1306, 1319 (1st Cir. 1994) ("[B]ecause we have no way of determining which instruction the jury applied, we must instead ask whether we can affirm the conviction based on the erroneous instruction."). Therefore, we conclude that the court's instructions did not substantially incorporate an innocent possession defense.

The third and final question is whether the innocent possession instruction was so integral to this case that its omission seriously impaired Baird's ability to present his defense. See Mercado, 412 F.3d at 251. There is no doubt that the innocent possession defense was central to Baird's case--indeed, it was the only case he put on, and he repeatedly asked the court to consider the instruction so that he could make out his defense. In light of the inconsistencies in Hatch's story and the fact that Hatch made a deal with the government in exchange for his testimony against Baird, the jurors may well have credited Baird's version of the events but still felt bound to convict him based on the instructions given. The issue was clearly on the jurors' minds, given the question they asked the court during deliberations, and as already discussed, the court's response to their query was opaque. Without the innocent possession instruction, the district

court's charge to the jury was entirely aligned with the prosecution's case against Baird.

Although we hold that an innocent possession instruction should have been given in this case, our decision does not represent an endorsement of the precise instruction requested by Baird. District courts have the "prerogative to craft the 'particular verbiage' that [they] will use in . . . jury instructions. So long as that language properly explains the controlling legal standards and is not unduly confusing or misleading, it will not be second-guessed on appeal." Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 378 (1st Cir. 2004) (quoting Febres v. Challenger Caribbean Corp., 214 F.3d 57, 62 (1st Cir. 2000)). All we decide here is that Baird should have been given the opportunity to raise the defense that after Hatch told him the weapon was stolen on September 5, the brief time that he spent in possession of the pistol before he handed it back did not violate § 922(j).

## III. Conclusion

We conclude that the district court erred as a matter of law by declining to instruct the jury on an innocent possession defense. Therefore, we vacate Baird's conviction and remand the case for a new trial.

So ordered.