# United States Court of Appeals
## For the First Circuit

No. 19-2188

UNITED STATES OF AMERICA,

Appellee,

v.

MITCHELL DANIELLS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Montecalvo, Circuit Judges.

Inga L. Parsons, with whom Law Offices of Inga L. Parsons and Matthew Gilmartin were on brief, for appellant.

Karen Eisenstadt, Assistant United States Attorney, with whom Rachael S. Rollins, United States Attorney, and Nathaniel R. Mendell, Acting United States Attorney, were on brief, for appellee.

August 22, 2023

BARRON, **Chief Judge**. In this appeal, Mitchell Daniells challenges his two federal, gun-related convictions. The first is for willfully violating 18 U.S.C. § 922(n), the federal prohibition on the receipt of a firearm by someone "under indictment for a crime punishable by imprisonment for a term exceeding one year," see id. § 924(a)(1)(D). The second is for willfully violating 18 U.S.C. § 922(a)(1)(A), the federal prohibition on "dealing in firearms" without a license.

Daniells contends that the former conviction must be reversed due to insufficient evidence or, in the alternative, vacated due to instructional errors. He contends that the latter conviction must be vacated on the ground that he was denied effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Alternatively, he contends the Sixth Amendment entitles him to an evidentiary hearing about whether his counsel had an actual conflict of interest, such that we must remand as to this conviction for that hearing to be held.

Finally, Daniells contends that, even if his convictions may stand, his sentence cannot. Here, he asserts that a "trafficking of firearms" enhancement under the United States Sentencing Guidelines ("Guidelines") was wrongly applied to him at his sentencing. See U.S.S.G. § 2K2.1(b)(5).

We vacate the § 922(n) conviction because we conclude that there was an instructional error as to the "willfully" element

- 2 -

of that offense.  We leave the § 922(a)(1)(A) conviction in place but remand to the District Court for an evidentiary hearing on Daniells's actual-conflict-based Sixth Amendment claim.  We also vacate Daniells's sentence based on his claim that he was wrongly subject to the "trafficking of firearms" enhancement.

## I.

A federal grand jury in the United States District Court for the District of Massachusetts indicted Daniells on June 16, 2015.  The indictment charged Daniells with one count of violating § 922(n) for receiving a firearm -- specifically, a firearm that he then sold to another individual in March 2015 -- while he was "under indictment" for a crime punishable by more than one year's imprisonment ("Count 1").  Daniells was arrested on the charge shortly after he was indicted.

The grand jury handed up a superseding indictment on March 22, 2017, that added one count for dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A) ("Count 2").  That statute provides in relevant part that "[i]t shall be unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."

Roughly a year later, the grand jury handed up a second superseding indictment. It added a count for obstruction of justice in violation of 18 U.S.C. § 1503 ("Count 3"), and a count for witness tampering in violation of 18 U.S.C. § 1512(b)(1) ("Count 4").

An eight-day trial began on May 21, 2019. After the government rested its case, Daniells moved for judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29, but the District Court denied the motion. Daniells renewed the motion after the close of evidence, but the District Court denied the motion once again.

The jury delivered its verdict on May 30, 2019. The jury found Daniells guilty on Counts 1 (receiving a firearm while under indictment) and 2 (dealing in firearms without a license), but not guilty on Counts 3 (obstruction of justice) and 4 (witness tampering).

The Supreme Court of the United States decided Rehaif v. United States, 139 S. Ct. 2191 (2019), about three weeks after the jury's verdict. The Court held in that case that for the government to obtain a conviction for the offense of "knowingly," 18 U.S.C. § 924(a)(1)(D), violating the prohibition set forth in § 922(g) on certain categories of individuals possessing a firearm, the government must "prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant

category of persons barred from possessing a firearm," see Rehaif, 139 S. Ct. at 2200.

Daniells filed a motion pursuant to Federal Rule of Criminal Procedure 33 based on Rehaif. The motion asked the District Court to reconsider the denial of Daniells's motion for acquittal on Count 1 on the ground that, under Rehaif, the evidence did not suffice to show that he acted "willfully" or, in the alternative, to grant him a new trial on Count 1 in consequence of what he claimed was an instructional error that Rehaif exposed regarding the "willfully" element of the offense that § 922(n) sets forth. The District Court denied the motion.

The District Court sentenced Daniells on November 12, 2019, to 97 months in prison -- 37 months of imprisonment on Count 1, and 60 months of imprisonment on Count 2, to be served consecutively. The District Court entered the judgments of conviction against Daniells and his sentence the following day. This timely appeal followed.

## II.

We start with Daniells's challenge to the District Court's denial of his Rule 29 motion with respect to his § 922(n) conviction.[1] He contends that the evidence does not suffice to satisfy either the "under indictment" element or the "willfully"

_____

[1] Daniells does not challenge the sufficiency of the evidence as to his conviction for willfully violating § 922(a)(1)(A).

element of the underlying offense. After recounting the relevant undisputed facts, we will explain why we conclude that there is no merit to the challenge.

**A.**

Daniells purchased at least three firearms in his own name, one in December 2012 and two in March 2013, at gun shops in Pennsylvania. He held a license to carry a firearm in that state at the time of the purchases.

As to each purchase, Daniells filled out Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Form 4473. The form explained through a questionnaire that certain prospective gun buyers are "prohibited" from "receiving or possessing" a firearm, including those who are "under indictment or information in any court for a felony, or any other crime for which the judge could imprison you for more than one year." The form elsewhere explained that § 922(n) is the source of that prohibition.[2]

In March 2014, an officer from the Weston, Massachusetts police department arrested Daniells for carrying a loaded gun without a Massachusetts firearm license. See Mass. Gen. Laws ch. 269, § 10(a). The arresting officer applied in the Waltham

---

[2] The form stated: "18 U.S.C. § 922(n) prohibits the shipment, transportation, or receipt in or affecting interstate commerce of a firearm by one who is under indictment or information for a felony . . . or any other crime, punishable by imprisonment for a term exceeding one year."

District Court in Massachusetts for a criminal complaint against Daniells. The officer did so by signing a criminal complaint form before a clerk magistrate, and the criminal complaint issued from the court the next day.[3]

A second criminal complaint, endorsed by that same officer, issued against Daniells on October 8, 2014 (together with the March 2014 complaint, the "Massachusetts criminal complaints"). It also concerned the earlier arrest but set forth a separate charge that related to the ammunition in the loaded firearm that Daniells had purchased in his own name. See id. § 10(n).[4] Daniells was arraigned on these state charges but released on bail.

---

[3] A law-enforcement-officer-signed criminal complaint, under Massachusetts law, may issue from the court in which the officer filed it only upon a determination of probable cause to bring the charge by a "judicial officer" of that court, such as a clerk magistrate. See Mass. R. Crim. P. 3(g)(2) ("The appropriate judicial officer shall not authorize a complaint unless the information presented by the complainant establishes probable cause to believe that the person against whom the complaint is sought committed an offense."); see also District Court Standards of Judicial Practice: The Complaint Procedure, Tr. Ct. of the Commw. of Mass. at 9 (Oct. 1, 2008), available at https://www.mass.gov/how-to/file-a-criminal-complaint ("If the application for complaint is in proper order, the officer seeking the complaint should be directed promptly to a magistrate for a probable cause determination. No criminal complaint may be authorized unless a magistrate determines that probable cause exists for each offense included in that complaint.").

[4] Each complaint stated a potential penalty on its face -- "state prison not less than 2 1/2 years not more than 5 years; or jail or house of correction not less than 18 months or not more than 2 1/2 years" for the § 10(a) charge, and "jail or house of

- 7 -

In January 2015, a man named William Roberts, a former co-worker of Daniells's who lived in Pennsylvania, posted on Facebook that he was looking for a roommate so that he could make ends meet. Daniells expressed interest and mentioned to Roberts that he had a way that Roberts could potentially earn some money.

Daniells and Roberts met days later and went to a gun store together. There, Daniells identified two guns that he wanted Roberts to purchase and provided money to Roberts to use to complete the sale.

Following a similar pattern, Daniells and Roberts met the following month at a different gun store in Pennsylvania. Roberts purchased four Taurus guns at the store, each of which Daniells had identified for Roberts to buy.

On each occasion, Roberts gave the guns to Daniells after buying them. And, on each occasion, Daniells provided Roberts around $100 for the guns.

After Daniells was back in Massachusetts, he drove with a friend, Paul Copithorne, to meet Benjamin Figueroa in Fall River, Massachusetts. Daniells used a drilling tool once there to remove the serial number from one of the four Taurus guns and then gave the gun to Figueroa. Copithorne testified that, on a later occasion, he helped remove the serial number from another of the

correction not more than 2 1/2 years from and after expiration of sentence for violation of § 10(a)" for the § 10(n) charge.

Taurus guns before he saw Daniells give Figueroa a box that he believed contained that gun.

At some point in mid-March 2015, a man named Timothy Bailey approached Daniells at a park in Boston to ask if Daniells had any guns for sale. Bailey had a potential customer who had inquired about obtaining a gun, and Bailey wanted to profit from making the sale. Bailey could not buy a gun from a licensed dealer himself, because he had been convicted of a felony. See 18 U.S.C. § 922(g)(1). Daniells told Bailey that he did not have any guns at that point but would obtain some soon thereafter, and the two men exchanged phone numbers.

On March 26, 2015, Daniells took another trip to Pennsylvania. This time, he did so with a friend named Kenneth Brobby, who was unemployed at the time. The two men stayed overnight with Roberts. The next day, that trio drove to two different gun stores. At each store, Roberts took money from Daniells to make gun purchases.

Daniells sold Bailey one of the guns that Daniells had obtained just days earlier with Roberts's assistance, and Bailey in turn sold that gun to his customer. That customer was -- unbeknownst to Bailey -- a confidential informant for the ATF.

About a week later, ATF agents contacted Roberts to ask him about the firearms that he had purchased. Roberts admitted that he did not have the firearms because he had bought them for

Daniells as a straw purchaser. Daniells was then indicted and tried on the § 922(n) count, which was based on his receipt of the gun from Roberts that he then sold to Bailey, as well as the other counts described above.

At trial, Daniells introduced testimony by an ATF agent that federal law defines an "indictment" to "include[] an indictment or information." See 18 U.S.C. § 921(a)(14). Daniells also introduced testimony from that agent that ATF forms and regulations, see 27 C.F.R. § 478.11, advise gun purchasers that an "indictment" is a charging document approved by a grand jury and that an "information" is a charging document approved by the "prosecuting attorney" but qualifies as an "indictment." Daniells further introduced testimony that the Massachusetts criminal complaints against him were not approved by a grand jury or prosecuting attorney, but were signed by a police officer.

**B.**

Daniells's first argument for seeking reversal of his § 922(n) conviction on sufficiency grounds concerns that offense's "under indictment" element. We understand Daniells to be arguing that reversal is required because the sole basis for finding that he was "under indictment" at the time of his receipt of the firearm in question are the Massachusetts criminal complaints that were issued against him. He reasons that such complaints cannot supply the evidentiary basis for proving the "under indictment" element

because, as a class, they do not render a defendant "under indictment" within the meaning of § 922(n) when they are signed -- as Daniells's Massachusetts criminal complaints were -- only by a police officer and not the prosecuting attorney. Because this aspect of Daniells's sufficiency challenge presents a question of statutory interpretation about the meaning of "under indictment" in § 922(n), see United States v. Rivera, 131 F.3d 222, 224 (1st Cir. 1997) ("[T]he interpretation of a statute presents a purely legal question."); see also United States v. Brede, 477 F.3d 642, 643-44 (8th Cir. 2007) (treating the question whether a Minnesota criminal "complaint" fell within the meaning of "under indictment" as a question of statutory interpretation), our review is de novo, see Rivera, 131 F.3d at 224.

We last had occasion to address the scope of the "under indictment" element in Quinones v. United States, 161 F.2d 79 (1st Cir. 1947), which concerned that element as it appeared in an earlier version of the offense. See id. at 81; see 15 U.S.C. § 901(e), repealed by Omnibus Crime Control and Safe Streets Act, Pub. L. 90-351, 82 Stat. 197, 234 (1968). The defendant argued that the evidence that showed that he had been issued a criminal information under Puerto Rico law did not suffice to prove that he was "under indictment" because a criminal information was not itself an "indictment." See Quinones, 161 F.2d at 80.

- 11 -

Quinones rejected the challenge on the ground that Congress used the phrase "under indictment" as, in effect, a term of art to encompass a "broad[er]" scope of formal charging mechanisms than the word "indictment" on its own might otherwise imply.  See id. at 80-81.  "With the object in mind of grouping together in a class of potentially dangerous persons," Quinones explained, it is "much more reasonable to assume that Congress intended to make inclusion in the interdicted class depend upon whether" the relevant type of criminal charge "had formally been made rather than upon the precise method or technique by which such a charge when made comes before a court for trial."  Id. at 81.  We thus held that the Puerto Rico criminal "information" at issue in that case rendered the defendant "under indictment" for purposes of the statute of conviction, while observing that "all charges of crime" in Puerto Rico courts at the time were initiated by an "information" filed by the "prosecuting attorney" "in accordance with Puerto Rican procedure."  Id. at 80-81; see also Schook v. United States, 337 F.2d 563, 567-68 (8th Cir. 1964) (expressly agreeing with Quinones's holding and explaining that "[t]here is no essential difference in the function or consequence of an 'indictment' and an 'information'" because "both are notices to the accused of charges in the name of the sovereign for [an] alleged violation of its penal statutes").

Daniells is right that the type of formal charging document that is involved in his case differs from the type that was at issue in Quinones, because the latter type was signed by the prosecuting attorney and his type was not. But a Massachusetts criminal complaint constitutes a formal charging document even when signed only by a police officer. And, we conclude that Quinones's reasoning warrants the conclusion that such a criminal complaint is the kind of formal charging mechanism that brings the person subject to it within the "class of potentially dangerous persons" that Congress intended to be considered "under indictment." See 161 F.2d at 81.

Daniells argues otherwise in part because, following Quinones, Congress added a statutory definition of "indictment." See Omnibus Crime Control and Safe Streets Act, 82 Stat. at 227 (1968). That definition now appears as 18 U.S.C. § 921(a)(14) and states: "The term 'indictment' includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted."

Daniells contends that, however one might have construed the "under indictment" element based on Quinones alone, the subsequent enactment of this statutory definition of "indictment" requires the conclusion that only "indictment[s]" and "information[s]" fall within the scope of the "under indictment"

- 13 -

element.  He thus argues that the Massachusetts criminal complaints issued against him did not render him "under indictment."

But, in so contending, Daniells does not dispute that a formal charging document that is called a "criminal complaint" can fall within the scope of the "under indictment" element even though it is not called an "indictment" or "information."  And, indeed, courts have consistently construed the "under indictment" element in the wake of the enactment of the statutory definition to encompass "criminal complaints" even though the statutory definition makes no reference to them.  See Brede, 477 F.3d at 643–44; Sears v. United States, No. 10-1215, 2011 WL 1642008, at *6 (W.D. Pa. May 2, 2011).

Thus, Daniells appears to be contending that although a criminal complaint can fall within the scope of the "under indictment" element, it can do so only when it is signed by the prosecuting attorney.  And that is so, he appears to be contending, because only in that event is a "criminal complaint" in substance the same as an "information."

The use of the word "includes" in the statutory definition of "indictment" indicates, however, that the definition of "indictment" encompasses more than "indictment[s]" and "information[s]," see 18 U.S.C. § 921(a)(14); see also, e.g., Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 162 (2012) (noting that the use of the word "includes" is "significant because

it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive").  We thus do not see why the definition must be read to exclude functionally equivalent charging mechanisms that may diverge in particulars from the ones listed in § 921(a)(14).

Nor does the statutory definition of "indictment" mention any requirement that the prosecuting attorney sign the charging document in providing that an "information" constitutes an "indictment."  Thus, we do not see why a formal charging mechanism must have been so signed to be, in substance, the kind of formal charging mechanism that -- like an "information" or "indictment" -- can render a person "under indictment."[5]

Daniells does attempt to bolster his position by pointing out that the case law that the government relies on in

---

[5] Daniells points out that an ATF regulation defines "indictment" in the same way that 18 U.S.C. § 921(a)(14) does but then goes on (unlike the statute) to specify that an "information" is a "formal charge" that is signed by a "prosecuting attorney." See 27 C.F.R. § 478.11 ("Indictment[] [i]ncludes an indictment or information in any court . . . .  An information is a formal accusation of a crime, differing from an indictment in that it is made by a prosecuting attorney and not a grand jury.").  He contends that this definition shows that the Massachusetts criminal complaints at issue cannot bring someone "under indictment" because they cannot be construed as "information[s]" given that they were not approved by a prosecuting attorney.  But, even if the ATF regulation were relevant to our interpretation of the scope of the "under indictment" element in § 922(n), the argument would fail because its premise is the same one that we have already rejected -- that the type of "formal charge" that the "under indictment" element "includes" is limited only to "indictment[s]" or "information[s]."

- 15 -

asserting that the "under indictment" element encompasses even criminal complaints that are not signed by the prosecuting attorney involves criminal complaints that the prosecuting attorney had signed. See Brede, 477 F.3d at 643-44 (holding that a Minnesota criminal complaint, which must be signed by a prosecutor, see Minn. R. Crim. P. 2.02, was "functionally equivalent" to an information or indictment for § 922(n) purposes). But, Brede does not hold that a criminal "complaint" falls within the "under indictment" element only when signed by the prosecuting attorney. See 477 F.3d at 644 (explaining that the defendant "became subject to the prohibitions of § 922(n) when the state of Minnesota filed the felony complaints against" him); accord Sears, 2011 WL 1642008, at *6 (inquiring whether the complaint was the "appropriate mode of instituting the proceedings in state court" to determine whether the defendant was "under indictment" for purposes of § 922(n)).

We also are unpersuaded by Daniells's contention that Quinones itself held that the Puerto Rico information at issue there fell within the scope of the "under indictment" element only because it was signed by the "prosecuting attorney." Quinones, 161 F.2d at 81. Quinones did reference the Puerto Rico law requirement that the "prosecuting attorney" sign the criminal information. But Quinones did so only while explaining that a criminal information was a means of lodging a formal criminal charge. See id. at 80-81. We thus do not see how the reference

- 16 -

in and of itself excludes criminal complaints that are not signed by the prosecuting attorney.

Daniells separately contends that Quinones is distinguishable from his case because Massachusetts, unlike Puerto Rico at the time of Quinones, permits formal criminal charges to be lodged not only by criminal complaints but also by grand juries handing up indictments. But Quinones does not suggest that the "general class of potentially dangerous persons" that Congress intended to encompass includes only those persons who have been issued a criminal information in a jurisdiction that uses no other type of formal criminal charge to initiate a criminal prosecution. See 161 F.2d at 80-81.

Moreover, neither the statutory definition of "indictment" nor § 922(n) makes any reference to a requirement that a formal charging mechanism that is not itself an indictment may render a person "under indictment" only in a jurisdiction that uses no other mechanism to initiate a formal criminal charge. And out-of-circuit precedent is uniform in holding that the "under indictment" element encompasses criminal complaints that are issued from states that also employ other means of lodging formal criminal charges. See Brede, 477 F.3d at 643-44; Sears, 2011 WL 1642008, at *6.

In sum, we have long understood the text of the "under indictment" element of the offense that now appears in § 922(n) to

- 17 -

reflect Congress's intention to account for the wide variety of ways that different jurisdictions in the United States permit formal criminal charges to be initiated. See Quinones, 161 F.2d at 80-81; see also, e.g., Schook, 337 F.2d at 567. In addition, no subsequent statutory enactment suggests that we were mistaken in so understanding Congress's aim. Finally, under Massachusetts law, a criminal complaint may issue from the court in which the police officer filed it only upon a determination of probable cause to bring the charge by a "judicial officer" of that court. See Mass. R. Crim. P. 3(g)(2). Such a criminal complaint, therefore, is a type of formal charging mechanism that emanates from a legal process that is, functionally, as reflective of the seriousness of the initiation of a formal criminal charge as the process from which the criminal information at issue in Quinones emanated. Accordingly, we conclude that a defendant who has been issued such a criminal complaint is among the "class of potentially dangerous persons" to whom Congress intended § 922(n) to apply.

## c.

We move on, then, to Daniells's more record-based contention as to why his § 922(n) conviction must be reversed on sufficiency grounds. Here, he focuses on the "willfully" element in § 922(n). We review such a preserved sufficiency challenge de novo. See United States v. Oliver, 19 F.4th 512, 516 (1st Cir. 2021). In undertaking such review, we look to see whether a

rational juror could find that all the evidence proved the element in question beyond a reasonable doubt. See United States v. Fuentes-Lopez, 994 F.3d 66, 71 (1st Cir. 2021). We draw "all reasonable inferences from the evidence in favor of the verdict," Oliver, 19 F.4th at 519 (citing Fuentes-Lopez, 994 F.3d at 71), while rejecting "evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative," United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (quotation omitted); see also United States v. Guzman-Ortiz, 975 F.3d 43, 55 (1st Cir. 2020) ("[A] judge may not pursue a 'divide and conquer' strategy in considering whether the circumstantial evidence [in the record] adds up . . . . But, neither may a judge stack inference upon inference in order to uphold the jury's verdict." (quotations omitted)); id. ("The strength of [such] inference[s] cannot be decided in a vacuum." (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007))).

Daniells contends that the "willfully" element in § 922(n) required the government to prove that he knew that his Massachusetts criminal complaints rendered him "under indictment" at the time that he received the firearm at issue. But, he contends, the evidence in the record does not suffice to permit a rational juror to find that he had such knowledge at that time.

The government responds that the "willfully" element required it to prove only that Daniells knew that his receipt of

the firearm was "unlawful" and not that he knew that his receipt of it was "unlawful" because he was "under indictment" at the time. But, despite advancing this response to Daniels's challenge, the government ultimately does not appear to rely on it.

We say that because the government appears to accept that, in Daniells's specific case, the only evidence in the record that could suffice to show that he knew that it was unlawful for him to receive the firearm was the evidence in the record that would suffice to show that he knew that his receipt of the firearm was unlawful because he had received the Massachusetts criminal complaints. Moreover, the government appears to accept that, in consequence of that feature of the record in Daniells's case, there is no evidence in the record that could suffice to support a finding that Daniells knew that it was unlawful for him to receive the firearm apart from the evidence in the record that could suffice to support a finding that he knew that the Massachusetts criminal complaints rendered him "under indictment" for purposes of § 922(n). Thus, in the end, the government does not appear to offer an argument that the evidence suffices to show that Daniells acted willfully that is independent of the argument that the evidence suffices to show that he knew that he was "under indictment" at the time that he received the firearm.

This understanding of the government's position, however, does not help Daniells. For, as we will next explain, we

conclude that the evidence does suffice to show that Daniells knew that he was "under indictment" at the relevant time.

The evidence supportably shows that Daniells had purchased firearms without using a straw purchaser in both 2012 and 2013, which was before he had received the Massachusetts criminal complaints. The evidence then further supportably shows that starting in 2015 -- and thus soon after Daniells had received the Massachusetts criminal complaints in 2014 -- he used a straw purchaser to purchase multiple firearms.

From the conspicuous timing of this shift in the means that Daniells used to acquire a firearm, a rational juror could infer that Daniells resorted to the use of a straw purchaser when he did because he believed that, in consequence of his Massachusetts criminal complaints, he needed to avoid detection of his firearms purchases even though he previously did not. Moreover, from the other evidence in the record, a rational juror reasonably could infer that the reason for that shift was that Daniells knew that it was unlawful for him to receive a firearm because those criminal complaints rendered him "under indictment" and so subject to the criminal prohibition that § 922(n) sets forth.

Supporting that latter conclusion is the evidence of statements that Daniells himself made after the criminal complaints had been issued against him and he had received a

- 21 -

firearm. Daniells reportedly said in one of those statements that he was concerned about the possibility that "the ATF will come and catch us or something on the highway." His reference as of that time specifically to the ATF indicates an awareness on his part that the conduct that he had engaged in by that time was conduct that violated a <u>federal</u> firearms prohibition, rather than a state one. Moreover, the record also contains evidence of another statement by Daniells in which, upon learning that ATF investigators had been in touch with Roberts, he reportedly encouraged Roberts to tell the investigators that he did not "give" Daniells the guns in question and to tell the ATF agents, instead, that he did not have the guns because they had been stolen. By focusing on the need to make sure that ATF agents did not know Daniells had received a firearm, the statement indicates an awareness on Daniells's part that the very conduct in which he had engaged and that he was concerned about the ATF discovering was the conduct that § 922(n) prohibits when a person is "under indictment."

In addition to the fact that the record supportably shows that Daniells made these statements after he had -- in the wake of receiving the Massachusetts criminal complaints -- resorted to the use of a straw purchaser, the record also contains evidence that Daniells knew about § 922(n) by the time that he received the firearm in question. The record shows in that regard that, by

that time, he was familiar with § 922(n) by virtue of the questionnaires on the ATF forms that he had completed in 2012 and 2013. In addition, testimony at trial supportably shows that Daniells took steps -- such as removing serial numbers from guns -- that were consistent with him being a sophisticated black-market firearms dealer and thus someone familiar with federal firearms laws. Cf. United States v. Andrade, 135 F.3d 104, 110 (1st Cir. 1998) (pointing to "the scale of [the defendant]'s gun smuggling activity" as one "indication[] of his awareness" that his conduct was unlawful); United States v. Rodriguez, 132 F.3d 208, 213 (5th Cir. 1997) (explaining that a juror could infer from evidence of a defendant's experience working with firearms that the defendant was familiar with the firearms laws).

Daniells does assert that the evidence shows that the ATF forms that he had to fill out when making the purchases of firearms on his own suggested to him that his Massachusetts criminal "complaints" did not render him "under indictment." He notes that the forms mentioned only "indictments" and "informations" and not "criminal complaints."

Daniells also notes that nothing else in the record could be understood to show that he had been advised that the criminal complaints rendered him "under indictment" or that he otherwise fell within § 922(n)'s prohibition. He points out as well that we had not directly held at the time of the events in question that

Massachusetts criminal complaints, even if not signed by the prosecuting attorney, are the kinds of formal charging documents that the "under indictment" element encompasses.[6]

Daniells then goes on to contend that his resort to the use of a straw purchaser and the statements described above are open to interpretation. Rather than revealing that he knew that he was prohibited by § 922(n) from receiving a firearm, the conduct and statements on his view reasonably may be understood to show only that he was motivated to resort to a straw purchaser to avoid detection of his contemporaneous conduct in "dealing" guns. Or, he suggests, that conduct and those statements reasonably could support the inference that he used the straw purchaser only out of his concern about being caught with firearms in Massachusetts because he did not have a license to possess or carry in that state.

Daniells does not account, however, for what the evidence shows about the timing of his resort to the use of a straw purchaser and the fact that it followed so closely after he had received the criminal complaints. Nor does he account for the fact that his statements evinced concern about having engaged in the very kind of conduct that § 922(n) makes a crime and that he

---

[6] The government conceded at oral argument that this set of facts was relevant to Daniells's mens rea at the time he received the firearm at issue.

- 24 -

was wary of being caught by federal firearms investigators in particular.

That Daniells fails to account for those features of the record is significant because it is not enough for Daniells to show that the various features of the record that he highlights would permit a rational juror to find him not guilty. He needs to show, even on his own telling, that the record demonstrates that "no reasonable jur[or] could have found that Daniells knew that he was under indictment." And, while we may not "stack inference upon inference in order to uphold the jury's [guilty] verdict," Guzman-Ortiz, 975 F.3d at 55 (quoting United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995)), neither may we pursue a "divide and conquer" strategy in considering what the evidence as a whole suffices to show, id. Indeed, precisely because the "strength of an inference cannot be decided in a vacuum," id. (quoting Tellabs, Inc., 551 U.S. at 323), the greater the volume of circumstantial evidence that tends to make the version of the facts supporting the verdict more "likely . . . as compared to others," the more likely that such evidence will be held sufficient to carry it, id.

Thus, while it may be that each single piece of evidence that bears on whether Daniells knew that he was "under indictment" is open to interpretation, we must consider the record as a whole in assessing his sufficiency challenge. And the totality of the evidence -- circumstantial though it is -- supportably shows that

Daniells resorted to the use of a straw purchaser on the heels of the criminal complaints; that he wanted to conceal his conduct; that the conduct that he wanted to conceal from the ATF agents was the very conduct that § 922(n) prohibits (his receipt of firearms); that by then he knew about § 922(n) from the ATF questionnaires that he had earlier completed; and that he was experienced in dealing in firearms in the black market and so would have been familiar with federal firearms laws. We therefore conclude that a rational juror supportably could find beyond a reasonable doubt that Daniells had the knowledge that he contends that the government needed to prove that he had -- namely, that he knew that it was unlawful for him to receive a firearm because he knew that his criminal complaints rendered him "under indictment."[7]

## III.

Daniells contends that even if his § 922(n) conviction need not be reversed, it must be vacated because of a due process

---

[7] Daniells argues in his supplemental brief that his § 922(n) conviction must be reversed because the government failed to prove that he knew that the Massachusetts criminal complaints charged him with offenses punishable by more than one year of imprisonment. This claim is not preserved because it was not raised in the District Court, so it is subject to plain-error review. And, for the same reasons we conclude that the evidence as a whole suffices to permit a rational juror to find beyond a reasonable doubt that he knew that he was "under indictment," we also conclude that it suffices to permit a rational juror to find that he knew that he had been charged with crimes punishable by more than one year of imprisonment. And, we add, the complaints stated the potential greater-than-one-year penalties on their face.

violation resulting from the District Court's instructional errors. See United States v. Latorre-Cacho, 874 F.3d 299, 302 (1st Cir. 2017) (citing Middleton v. McNeil, 541 U.S. 433, 437 (2004)); United States v. McLellan, 959 F.3d 442, 465-67 (1st Cir. 2020). We disagree with Daniells's contention that the District Court erred in instructing the jury on the "under indictment" element. But we agree with Daniells that the District Court erred in instructing the jury as to the "willfully" element and that the conviction therefore must be vacated.

### A.

Daniells contends that the District Court's instruction that the criminal complaints rendered him "under indictment" necessarily -- but wrongly -- treated the question of whether the criminal complaints rendered him "under indictment" as if it were a matter of law for the court to decide rather than a matter of fact for the jury to find. Reviewing de novo, United States v. Karani, 984 F.3d 163, 174 (1st Cir. 2021); United States v. Norris, 21 F.4th 188, 194 (1st Cir. 2021), we see no merit to the challenge.

We understand Daniells in this challenge to dispute only whether the "under indictment" element encompasses the type of formal charge that a Massachusetts criminal complaint represents when signed by a police officer and not the prosecuting attorney. But, as we have explained, the question of whether the "under indictment" element encompasses such a criminal complaint is a

- 27 -

question of statutory interpretation and so one of law rather than fact. See, e.g., Rivera, 131 F.3d at 224; United States v. Gaudin, 515 U.S. 506, 513 (1995); see also Brede, 477 F.3d at 643-44 (treating question of whether a Minnesota criminal complaint constituted an indictment purely as a question of law). Moreover, as we also have explained based on Quinones's reasoning, see 161 F.2d at 81, the "under indictment" element encompasses Massachusetts criminal complaints as a matter of law even when they are signed only by a police officer. Accordingly, this instructional challenge fails.

**B.**

Daniells's more substantial claim of instructional error concerns the "willfully" element. Here, he contends that the District Court erred by failing to instruct the jury as he had requested that to prove that he "willfully" violated § 922(n) the government needed to prove that he knew that his Massachusetts criminal complaints rendered him "under indictment."

Daniells appears to be contending, in part, that he was entitled to the requested instruction because § 922(n)'s "willfully" element always requires proof of knowledge of being "under indictment," rather than, as the government contends, merely proof of knowledge that the defendant's action of "receiving a firearm" was "unlawful" more generally. But, Daniells also argues more narrowly that he was entitled to the requested

- 28 -

instruction in his specific case because of the nature of the evidence that was in the record. See McLellan, 959 F.3d at 467 (setting forth our "three-part test" for review of a "district court's refusal to give a requested instruction" (quoting United States v. Figueroa-Lugo, 793 F.3d 179, 191 (1st Cir. 2015))); see also United States v. Flaherty, 668 F.2d 566, 581 (1st Cir. 1981) (explaining that the defendant is entitled to an instruction on his theory of defense where the evidence supports it and that this requirement is "equally applicable to situations where special facts present an evidentiary theory which if believed would defeat the factual theory of the prosecution" (quoting United States v. Leach, 427 F.2d 1107, 1112 (1st Cir. 1970))). We reject the former contention that Daniells makes but agree with the latter.

**1.**

Daniells relies chiefly on Rehaif for his more sweeping contention as to why he was entitled to his requested "willfully" instruction. But the government is right that Daniells is wrong to rely on Rehaif because that case concerned neither the "willfully" element in § 922(n) nor, for that matter, a "willfully" element at all. See 139 S. Ct. at 2195-200.

Daniells does also appear to assert that -- Rehaif aside -- a "willfully" element invariably requires proof of the more specific kind of knowledge that he contends that the "willfully" element in § 922(n) does. But, as the government emphasizes, we

- 29 -

made clear in Andrade that the "willfully" element in § 924(a)(1)(D) does not necessarily require the government to prove more than the defendant's knowledge that he was acting unlawfully in a "general" sense by engaging in the conduct that is prohibited by the statute of conviction. See 135 F.3d at 108-10. And yet, Daniells fails to address this aspect of Andrade in asserting that he was entitled to the requested "willfully" instruction based on the nature of any "willfully" element. Thus, we conclude that this more sweeping variant of his instructional challenge fails for lack of development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## 2.

We come, then, to Daniells's case-specific instructional challenge regarding the "willfully" element. The government does not suggest that Daniells either waived or forfeited this more narrow-gauged challenge. Indeed, the government was asked at oral argument whether Daniells was entitled in his specific case to the "willfully" instruction that he requested even if such an instruction is not generally required under § 922(n)'s "willfully" element. Although the government argued in response that Daniells was not, it did so only on the ground that the "willfully" instruction that was given was "sufficient" to convey that the jury had to find that Daniells knew that his conduct in "receiving

the firearm" was unlawful.  It thus contended that the instruction given sufficed to convey what the requested instruction would have.

Because of what the record shows as to whether Daniells raised this case-specific challenge to the denial of his "willfully" instruction both below and on appeal and the government's failure to argue that there was a forfeiture or waiver,[8] we proceed to address this challenge as preserved.  And, reviewing de novo, McLellan, 959 F.3d at 467; United States v. Baird, 712 F.3d 623, 627-28 (1st Cir. 2013), we conclude that the challenge has merit.

---

[8] Daniells not only argued to the District Court before Rehaif was handed down that he was entitled to the instruction at issue but also did so after he had contended to the District Court that there was no basis for convicting him of violating § 922(n) "in this case" unless the government proved that he knew that as a result of the Massachusetts criminal complaints he was "under indictment".  We note, too, that in refusing to give the requested instruction, the District Court did not suggest that it was refusing to do so only because the request was premised on the instruction being required in any case under § 922(n)'s "willfully" element.  Finally, Daniells's supplemental briefing on appeal incorporated his invocation in his opening principal brief of the three-part standard that we set forth in McLellan and have relied on in prior cases to determine when a particular instruction on an element may be required due to the evidence provided at trial, even though the element itself, in the abstract, may not require that such an instruction always be given.  See Flaherty, 668 F.2d at 581 (quoting Leach, 427 F.2d at 1112-13).  Daniells then goes on in that brief to argue that the failure to give the requested instruction would not be "harmless" in his case, given the state of the evidence presented at trial bearing on the "willfully" element.

With respect to a challenge to the denial of a requested instruction, McLellan first requires the defendant to make a "threshold" showing "that he was entitled to the instruction" that he requested. 959 F.3d at 467 (quoting Figueroa-Lugo, 793 F.3d at 191). The defendant thus first must show that the evidence adduced at trial supported the requested instruction. This "initial threshold determination," we have explained, turns on "whether the evidence, viewed in the light most favorable to the defense, 'can plausibly support the theory of the defense.'" Id. (quoting United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998)).

"If the evidence is sufficient, we then move on to a three-part test." Id. And, under that test, "the district court is reversed only if the proffered instruction was '(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense.'" McLellan, 959 F.3d at 467 (quoting Baird, 712 F.3d at 628).

In pressing his case-specific instructional challenge, Daniells argues that the government's only theory that he acted willfully was that at the time that he received the firearm in question he knew of § 922(n)'s prohibition on individuals who are "under indictment" "receiving" firearms and that he also knew by

that time that the Massachusetts criminal complaints brought him into that category of individuals. And, he further argues that his defense at trial focused on his theory that he did not know that receiving the firearm was unlawful precisely because he did not know that those complaints rendered him "under indictment."

So, "begin[ning] with the [threshold] question of whether the evidence at trial . . . plausibly support[s]" Daniells's theory of defense, Baird, 712 F.3d at 628, we conclude that the evidence does. The record plausibly supports the conclusion that Daniells would not have known that it was unlawful for him to receive the firearm that grounds his § 922(n) conviction unless he knew that he was "under indictment" at that time.

There is nothing in the record to indicate that -- absent knowledge of § 922(n)'s bar -- Daniells would have had any reason to know that he was so barred, even if he knew that he had received the Massachusetts criminal complaints (as the record shows that he did). There is no evidence, for example, that, apart from § 922(n), such criminal complaints would have imposed that criminal bar as a matter of state law or under some other provision of federal law.

There also is nothing in the record to indicate that Daniells would have had reason to understand § 922(n)'s bar to apply to him other than by reason of his knowing that his Massachusetts criminal complaints rendered him "under indictment."

Thus, his theory of defense does have plausible support in the record.

**b.**

We turn, then, to McLellan's "three-part test," which first requires the defendant challenging the denial of a requested instruction to show that instruction was "substantively correct as a matter of law." 959 F.3d at 467 (quoting Baird, 712 F.3d at 628). We conclude that Daniells has done so due to the special facts of his case.

If a rational juror could find on this record beyond a reasonable doubt that Daniells acted with knowledge that receiving the firearm at issue was unlawful even absent a finding that he knew that he was "under indictment," then it would follow that Daniells would be unable to show that his requested instruction was a substantively legally correct one. And, in that event, he could not satisfy McLellan's first prong. See 959 F.3d at 467; accord Leach 427 F.2d at 1112-13 (concluding that a "special facts"-based request was legally incorrect because it would have precluded the jury from reaching a guilty verdict on other permissible interpretations of the record that provided a supportable basis for finding the element proved).

But the government does not contend that a rational juror could so find on this record. Indeed, the government appears to accept that the only basis in the trial record for finding that

Daniells acted "willfully" in "receiving" the firearm is the record evidence that the government contends supports a finding that Daniells did know that he was "under indictment."

To that point, the government expressly conceded in its briefing and at oral argument that the only reason "as a factual matter" that Daniells would have known that it was unlawful for him to receive the firearm was if he knew that the Massachusetts criminal complaints brought him within the prohibition that § 922(n) sets forth because they rendered him "under indictment."

We see no reason to second guess the government's assessment of the record, given what the record shows. Cf. United States v. Tobin, 552 F.3d 29, 34 (1st Cir. 2009) ("accept[ing] [the government's] concession that assuming the statute [at issue] require[d] proof of purpose," its proof on the element would be insufficient). It is true, as we have explained in rejecting Daniells's sufficiency challenge to this same conviction, that the record shows that Daniells switched to buying guns through a straw purchaser in the wake of the issuance of the Massachusetts criminal complaints. It is also true, as we explained in rejecting that same sufficiency challenge, that testimony in the record shows that, after Daniells resorted to using the straw purchaser, Daniells expressed concerns about being caught by the ATF and about ATF agents discovering that the straw purchaser had given him the firearm that grounds the § 922(n) charge. But, as we have noted,

nothing in the record indicates that -- apart from § 922(n)'s prohibition -- the Massachusetts criminal complaints would have made it unlawful for Daniells to receive the firearm at issue when previously he was able to receive firearms. Nor can we say on this record that the switch alone suffices to permit a rational juror to find (rather than speculate) that he knew that the Massachusetts criminal complaints made it unlawful for him to "receive" the firearm.

Indeed, the record reveals that Daniells would have had other significant reasons to avoid detection of the purchase of the firearm at issue by federal investigators -- and so to use a straw purchaser when he did -- that had nothing to do with an awareness as to whether the receipt of a firearm was unlawful. Specifically, the firearm is one for which there is also evidence that Daniells arranged the purchase in connection with not just receiving it but also dealing it. And "dealing" the firearm is something that Daniells was barred from doing under § 922(a)(1)(A) for reasons that have nothing to do with his Massachusetts criminal complaints.

The picture does not change if we consider the statements that Daniells supposedly made about (1) being concerned about being caught by the ATF and (2) then learning that he had been "give[n]" the firearm. The first statement equally could support the theory that he was concerned about being caught dealing in firearms, and

the second statement was made in such a manner as to be ambiguous as to whether it was an expression of concern about his being caught "dealing" in firearms or merely his being caught having received one.

Given our oft-expressed concern about upholding a conviction against a sufficiency challenge on the basis of the stacking of inferences, and when there is an equally plausible explanation for the defendant's conduct that would warrant acquittal, Guzman-Ortiz, 975 F.3d at 55 (citing United States v. Andujar, 49 F.3d 16, 22 (1st Cir. 1995)), we follow the government in concluding that Daniells's defense theory, if believed, would defeat the factual theory of the prosecution, cf. Tobin, 552 F.3d at 34. It therefore follows that his requested instruction as to that theory was substantively correct as a matter of law.[9] Thus, Daniells has satisfied the first prong of the McLellan test.

_____

[9] We do not mean to suggest that the evidence would not suffice to satisfy the "willfully" element if there were evidence that Daniells had been advised that he could no longer receive a firearm after the Massachusetts criminal complaints issued but was not told that he could not do so because those complaints rendered him "under indictment." Cf. United States v. Minor, 63 F.4th 112, 121 n.6 (1st Cir. 2023) (en banc). But, as the government has explained, it proved the willfully element here precisely by showing that Daniells (1) was aware of the prohibition set forth in § 922(n) on the receipt of firearms by those who are "under indictment" and (2) changed his behavior close-in-time to the complaints, such that a juror could infer that he was aware that the complaints brought him within that prohibition. We thus have no occasion to address other scenarios. To be sure, the government does also point to testimony that Daniells told an alleged

We also conclude that Daniells has satisfied the third prong of the McLellan test, which requires us to consider whether the requested instruction was "integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense." 959 F.3d at 467 (quoting Baird, 712 F.3d at 628). We reach this conclusion because, if the jury ultimately "credited [Daniells]'s version" of the facts as to his state of mind at the time that he received the gun, then there would be no basis for the jury to convict him even under the government's understanding of what the "willfully" element requires. See Baird, 712 F.3d at 633. Indeed, as explained, there is no evidence in the record that Daniells had

accomplice that his "license to carry" firearms in Pennsylvania had been "suspended," which the government argues was coded language that reflects Daniells's awareness that he had become prohibited from receiving a firearm. But the government acknowledges that, like the other evidence supporting the willfully element, the evidence of Daniells's use of such coded language is probative only insofar as it shows Daniells's awareness that the issuance of the criminal complaints had triggered a change in his status with respect to his ability to receive a firearm. The government thus does not suggest that the statement independently supports a finding by the jury that Daniells had knowledge that the conduct of receiving the firearm was unlawful at the relevant time even if the jury believed that Daniells did not know that his complaints rendered him "under indictment" and thus within § 922(n)'s prohibition. We add that this understanding comports with the evidence, as the evidence does not show that Daniells's Pennsylvania license to carry had been suspended and thus the evidence would not support a finding that Daniells had knowledge that it would be unlawful to engage in the conduct of receiving a firearm because he knew that he had a suspended Pennsylvania license, even assuming that kind of knowledge could otherwise satisfy the willfully element here.

been advised without reference to § 922(n) that it was illegal for him to receive the firearm when he did. Nor does the government contend that there is evidence in the record that indicates that he would have known that it was unlawful for him to do so for reasons independent of his having been issued the Massachusetts criminal complaints that made him subject to § 922(n)'s criminal bar. And, again, our own review of the record provides us with no reason to take issue with the government on that score.

That leaves only the test's second prong, which concerns whether the instruction requested was "substantially covered by the charge as rendered." See McLellan, 959 F.3d at 467. "[T]he central inquiry" as to this prong on appeal "reduces to whether, taking the charge as a whole, the instructions adequately illuminate[d] the law applicable to the controlling issue[] in the case without unduly complicating matters or misleading the jury." United States v. DeStefano, 59 F.3d 1, 3 (1st Cir. 1995) (citations omitted).

The government contends that the "willfully" instruction that the District Court gave did "adequately illuminate the law applicable to the controlling issue[]" because the District Court instructed the jury that acting "willfully" meant acting "with the intent or bad purpose to disobey or disregard the law" and "the intent to do something that the law forbids." We are not persuaded.

The government concedes that, to satisfy the "willfully" element in § 922(n), it "did need to prove" that Daniells knew that the particular "conduct" of "receiving the firearm" was "unlawful" at the time that he received it, see Andrade, 135 F.3d at 108; see also Dixon v. United States, 548 U.S. 1, 5 (2006) (explaining that the "willfully" mens rea element in § 922(n) requires proof of the defendant's "knowledge that his conduct was unlawful"). So, the pivotal issue is whether the "willfully" instruction given conveyed to the jury that it needed to find that Daniells had that knowledge, as there is no question that the "willfully" instruction that Daniells requested -- for the reasons we have explained -- would have conveyed as much. See also, e.g., United States v. Moran, 503 F.3d 1135, 1147 (10th Cir. 2007) (explaining that a defendant's challenge to the district court's refusal to give a "fact specific" instruction about his defense failed on appeal only because the instruction given "adequately informed the jury of the relevant law").

The "willfully" instruction that the District Court gave, however, did not specify that Daniells needed to know that the "unlawful" conduct that he was intending to engage in was his receipt of the firearm. The terms of the instruction do not, for example, provide that to find that Daniells was acting willfully the jury had to find that he knew that he was acting unlawfully by receiving the firearm. The terms of the instruction provide only

- 40 -

that Daniells must have, "act[ing] with the intent to do something that the law forbids," (emphasis added) "received the firearm" at issue.

The government contends nonetheless that the instruction given conveyed essentially what Daniells's requested instruction would have conveyed.  But, we do not see how that can be so.

As Daniells points out, the record provides a basis for finding that he was doing "something" (to use the challenged instruction's own word) independent of receiving the firearm that was unlawful at the time that he was given it -- namely, dealing in firearms.  Indeed, he was being tried on a charge of unlawful firearms dealing in the very same trial for conduct that overlapped temporally with his conduct in allegedly violating § 922(g), and there is no dispute that evidence in the record suffices to support that "dealing" charge.

As a result, in Daniells's case, the instruction given presented precisely the problem that his requested instruction aimed to address.  It ruled in what his requested instruction would have ruled out -- a finding that he acted "willfully" in receiving the firearm while "under indictment" merely because he knew that he was acting unlawfully at that time by doing "something that the law forbids" (dealing in firearms), even if he did not know that he was acting unlawfully by receiving the firearm.  See Baird, 712 F.3d at 632-33 (holding that a defense instruction that was

warranted on the record was not "substantially incorporated" by the instructions given because we could "not know for sure that the jury" knew that it "could acquit" the defendant if it "believed" the defendant's factual theory).[10]

In that way, the instruction was noticeably different from the one given in Andrade. There, the district court instructed the jury that "[o]ne acts willfully when he intentionally commits the acts proscribed by law with knowledge that his conduct is unlawful." (Emphasis added). Read in context, that instruction is comfortably read to link the defendant's "knowledge" to "the acts proscribed by law." The instruction in this case, however, does not use language establishing such a link, because it provides only that the defendant "act with the intent to do something that the law forbids." (Emphasis added). Thus,

---

[10] In Baird, we concluded that a defendant charged with 18 U.S.C. § 922(j), which makes it a crime to receive or possess a stolen firearm, was entitled to an instruction that "the jury could . . . acquit [the defendant] if it found that he bought the gun without knowledge that it was stolen and that he disposed of the weapon as soon as reasonably possible after learning the truth." 712 F.3d at 628. We then rejected an argument by the government that the substance of that request was "substantially covered" by the district court's explanation to the jury that "the Government is not arguing that a person is guilty as soon as he/she had a reasonable cause to believe a firearm in their possession is stolen," because that instruction "did not do enough to inform the jury that it could acquit" the defendant "if it believed that he only possessed the gun for a few moments with knowledge that it was stolen." See id. at 633. So, too, here, it cannot be said that the instruction that was given informed the jury that it could acquit Daniells if it believed that Daniells did not know that his conduct in receiving the firearm was unlawful.

- 42 -

while the instruction given in Andrade would have sufficed in this case, the instruction that the District Court actually gave did not.[11]

We do not mean to suggest that the District Court was required to "parrot" the exact instruction that Daniells requested. DeStefano, 59 F.3d at 3. But the District Court was required under McLellan to give an instruction that made clear to the jury that it needed to find that Daniells knew that the "conduct" of "receiving a firearm" was "unlawful" at the time that he received it. And yet the District Court rejected an instruction that would have done just that -- the fact-based one that Daniells requested -- in favor of one that permitted the jury to base a guilty verdict on the problematic finding that his requested instruction would have prevented -- that is, a finding that Daniells acted "willfully" in receiving the firearm while "under indictment" merely because he knew that he was acting unlawfully

---

[11] Our opinion in Andrade also emphasized this link between the defendant's knowledge and the proscribed conduct in characterizing the position of the Second Circuit that we were embracing. See Andrade, 135 F.3d at 109-110 & n.4 (adopting Second Circuit's position "that the defendant [must] be aware that his conduct is unlawful" (emphasis added), and observing that Second Circuit's holding was based on its finding that "the evidence 'demonstrate[d] that [the defendant] understood that his firearm sales [(the relevant conduct at issue)] violated the law" (first alteration in original) (emphasis added) (quoting United States v. Collins, 957 F.2d 72, 77 (2d Cir. 1992)).

in some other way (e.g. dealing the firearm) even if he did not know that he was acting unlawfully by receiving the firearm, which is the conduct that § 922(n) proscribes.[12]

Due to the gap between what the instruction given conveyed and what the instruction requested would have conveyed, we conclude that the former instruction did not "substantially cover[]" the latter instruction. See McLellan, 959 F.3d at 467; Baird, 712 F.3d at 628. We also conclude that the government's contention that United States v. Griffin, 524 F.3d 71 (1st Cir. 2008), reveals otherwise is not persuasive.

That case addressed, on plain-error review, an instruction that involved a criminal statute that prohibits signing a false tax statement "willfully and knowing it was false." See id. at 76. It does not address the second prong of the McLellan test at all.

Daniells has thus satisfied McLellan's three-part test.

---

[12] We recognize that the District Court in the course of instructing the jury did say that Daniells must have known that he was "under state indictment at the time he received a firearm." The government does not argue, however, that this statement "substantially cover[ed]" what Daniells requested, McLellan, 959 F.3d at 467, and that is for good reason. The District Court made this statement to the jury in the context of the District Court's explanation to the jury that it was "not necessary to prove that [Daniells] knew the crime was punishable by a term in prison of more than one year." Indeed, in the very next sentence, the District Court further stated that "[i]t is enough for the government to prove that the defendant knew that the charge had been made against him at the time that he allegedly received the firearm."

- 44 -

**c.**

The government contends that, in any event, any instructional error on the "willfully" element was harmless. See McLellan, 959 F.3d at 466 (explaining that an error on an instruction that "deals with" an "element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element"); United States v. Doherty, 867 F.2d 47, 58 (1st Cir. 1989) (finding error in instruction on an element of the offense harmless because it was "virtually inconceivable that the jury could have found [the defendants] guilty . . . without believing that" the necessary factual finding had been established). But, here, too, we disagree.

Because the error deals with an essential element of the offense, the government bears the burden of making the showing that the error was harmless. McLellan, 959 F.3d at 466 (citing United States v. Wright, 937 F.3d 8, 30 (1st Cir. 2019)). It is not enough for purposes of this harmless error inquiry, moreover, for the government to show that the record evidence suffices to satisfy the "willfully" element. See United States v. Fernández-Jorge, 894 F.3d 36, 54 (1st Cir. 2018) (explaining that an instructional error regarding an element may not be harmless even where "we have concluded that, for Rule 29 purposes, a rational

fact-finder could have found" the necessary fact because that inquiry "requires far less than [a showing of] 'overwhelming' evidence").

The government does contend that any error was harmless beyond a reasonable doubt because the jury could not have found that Daniells, "act[ing] with the intent to do something that the law forbids," "received the firearm" without finding that Daniells knew that it was "receiv[ing] the firearm" that was unlawful. But, as we have already explained, the record certainly contained enough circumstantial evidence to support a juror's finding that Daniells knew that something else he was contemporaneously "inten[ding]" to do (e.g., "dealing" firearms) was forbidden by the law. The government has thus failed to show that the jury could not have convicted Daniells on the § 922(n) charge without making the necessary finding as to the willfully element. Our review of the District Court's instructions also reveals that there is nothing else in them that would have ensured that the jury made a finding that Daniells knew that receiving the firearm was unlawful at the time that he received it. Thus, the conviction must be vacated.[13]

---

[13] In light of our conclusion on this score, we do not address Daniells's remaining challenges that concern the jury instructions.

**IV.**

Daniells also challenges his conviction for willfully violating 18 U.S.C. § 922(a)(1)(A), the prohibition on "dealing in firearms" without a federal license. He does so on the ground that he was denied his Sixth Amendment right to counsel. See U.S. Const. amend VI. Once again, we set forth the relevant undisputed facts before addressing the merits.

**A.**

Shortly after Daniells was arrested, on July 15, 2015, he was questioned during a proffer session by federal agents in Massachusetts. The agents asked him about the identity of an individual who had traveled with him from Massachusetts to Pennsylvania on one of the gun-purchasing trips.

Daniells consulted with his then-counsel, Michael Schneider, before answering the agents. Daniells then identified Kenneth Brobby as the individual in question. The government at some point thereafter contacted Brobby and obtained incriminating information about Daniells.

During the same proffer session with Daniells, the agents also asked Daniells to provide the passcode for his iPhone, which they had seized upon his arrest. Daniells refused to do so. Roughly two weeks later, however, a government prosecutor emailed Schneider to determine whether Daniells would willingly provide

the passcode, and Schneider responded that he would speak to Daniells about it.

On August 4, 2015, the government obtained a warrant to search the phone and a court order directing Apple, Inc. ("Apple") to provide reasonable assistance to access its data. Thereafter, the government advised Daniells through Schneider that it would serve the order on Apple unless Daniells willingly provided his password.

Schneider obtained three potential passwords from Daniells during a meeting that same week. Not long after that, Schneider provided the potential passwords to the government.

Based in part on information obtained from Brobby and from Daniells's iPhone, the government obtained the superseding indictment that charged Daniells with dealing in firearms without a license. A few months after the superseding indictment had issued -- and after Daniells had obtained new pre-trial counsel, Gordon Spencer -- Daniells filed two motions seeking to suppress the evidence obtained as a result of the disclosures. The motions were based on the argument that Schneider's role in turning over Brobby's name and Daniells's passcode amounted to ineffective assistance of counsel.

Following a three-day evidentiary hearing on the matter, the District Court orally denied the motions to suppress on March 12, 2018. It then issued a written decision explaining its

reasoning shortly thereafter. United States v. Daniells, No. 15-CR-10150, 2018 WL 1639688 (D. Mass. Apr. 5, 2018).

After Spencer later withdrew from his case, Daniells -- through a new lawyer, Derege Demissie, who ultimately served as Daniells's trial attorney -- filed a motion for reconsideration of the suppression motions just described and a new evidentiary hearing. The motion contended in part that Spencer had been laboring under an actual conflict while he litigated the suppression motions because Spencer had been implicated in communicating allegedly improper messages to witnesses -- messages which later served as a basis for the obstruction and witness tampering charges brought against Daniells (Counts 3 and 4). The District Court summarily denied that motion at a pretrial conference.

**B.**

Daniells bases the Sixth Amendment challenge to this conviction in part on Strickland v. Washington, 466 U.S. 668 (1984), as he contends that he received constitutionally ineffective assistance of counsel. To succeed on his Strickland claim, he must show that counsel's performance was "deficient," and that the deficient performance prejudiced his defense. Id. at 687, 692.[14] "We review the district court's legal conclusions de

_____

[14] Although we generally address Sixth Amendment claims "on

- 49 -

novo and its findings of fact for clear error." Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012).

Insofar as Daniells's Strickland claim takes aim at the advice that his pre-trial counsel, Michael Schneider, gave him to provide agents the name of a witness (Brobby) who subsequently provided incriminating information about Daniells, it fails because Daniells has not shown prejudice. The District Court found as a matter of fact that, as of the time of the proffer session, government agents had already received information from a separate "cooperating witness" that "another person had accompanied Daniells to Pennsylvania" to make a straw purchase "on at least one occasion, but agents thought the witness had identified the wrong person." Daniells, 2018 WL 1639688, at *1. The government argues that these facts show that, even without having obtained Brobby's name at the proffer session, the government had an "obvious interest in identifying" him and an "active investigation" into the matter. Because Daniells makes no argument

---

direct appeal" only where the record is sufficiently developed for appellate review, United States v. Messner, 37 F.4th 736, 741 (1st Cir. 2022), we may consider Daniells's challenge here because the District Court both held an evidentiary hearing on the ineffective-assistance-based motion to suppress the evidence after Daniells had retained new counsel and resolved the issue on the merits after making factual findings, see Daniells, 2018 WL 1639688, at *3; see Messner, 37 F.4th at 742 (noting that where "the factual record is clear, we [may] proceed[] directly to reviewing the defendant's claim on the merits" (collecting cases)).

that the government -- absent his counsel's advice to disclose the name -- would have been unable to correctly identify Brobby and thus obtain the same incriminating information from him that it did in any event, he fails to show prejudice.  See Strickland, 466 U.S. at 700.

Insofar as Daniells bases his Strickland claim on Schneider's provision of Daniells's iPhone passcode to government investigators, it also fails because he does not show prejudice.  Daniells argues that the only reason that the government investigators discovered other incriminating evidence regarding his firearms dealing is that the iPhone password was provided to them.  But the District Court found that the government had already "obtained an order directing Apple to provide reasonable technical assistance to extract the data for the government."  Daniells, 2018 WL 1639688, at *3.  The District Court also found that the government would have ultimately been able to access the iPhone in any event by using an "unlocking tool."  Id. at *5.  And the government is correct that Daniells has made no showing that those findings were clearly erroneous on this record.

## C.

Daniells has one more basis for challenging his conviction for dealing firearms on Sixth Amendment grounds: He contends that the conviction must be vacated because he was deprived of his "right to representation that is free from

conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981) (citing Cuyler v. Sullivan, 446 U.S. 335 (1980)). That right is violated when the defendant can show that his counsel was laboring under an "actual conflict." See id. at 271-72.

The conflict Daniells asserts is that his defense counsel for his suppression motions, Spencer, had played a role in discouraging witnesses from cooperating in the investigation into Daniells and was being investigated by the government for that conduct. Daniells contends that this conflict was an "actual conflict" within the meaning of Cuyler because Spencer (1) "could have pursued a plausible alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties." United States v. Ponzo, 853 F.3d 558, 575 (1st Cir. 2017) (quoting United States v. Colón-Torres, 382 F.3d 76, 88 (1st Cir. 2004)); see also Brien v. United States, 695 F.2d 10, 15 (1st Cir. 1982) (explaining that, in assessing proffered "plausible alternative defense strateg[ies] or tactic[s]," the court need not find that they "would necessarily have been successful," but rather that they have "sufficient substance to be [] viable alternative[s]"). The specific error that Daniells contends that the District Court made with respect to this "actual conflict"-based Sixth Amendment claim, moreover,

is that it denied him the evidentiary hearing that he had requested on the claim.[15]

It is true that Daniells made his motion for the evidentiary hearing on this actual conflict claim in a motion for reconsideration (or rehearing) of the denial of the motions to suppress the evidence described above. But the actual conflict claim was premised on newly discovered evidence that Spencer may have been laboring under an actual conflict at the time of the suppression hearing (and thus on a ground for relief that he could not have previously asserted). Moreover, the District Court denied the hearing request on the ground that Daniells failed to present a "sufficiently persuasive argument of conflict" rather than that it was not properly raised in such a motion. Indeed, consistent with that understanding, the government does not contest that Daniells is entitled to an evidentiary hearing on the claim if he

---

[15] We note that Daniells, based on the Second Circuit's decision in United States v. Fulton, 5 F.3d 605, 609 (2d Cir. 1993), appears to suggest that we should adopt a "per se" rule for circumstances such as this one in which a government witness alleged direct knowledge of criminal conduct related to the defendant's alleged crimes, id. at 611 ("The per se rule applies when an attorney is implicated in the crimes of his or her client since, in that event, the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." (citations and quotation marks omitted)). But we need not address that question because we agree with Daniells's related argument that he was entitled to a hearing on his Cuyler claim even under the two-part "actual conflict" test. See Ponzo, 853 F.3d at 575.

can show on appeal that the District Court abused its discretion in denying the request for a hearing on the actual conflict issue that had been presented.  See United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013) (explaining that a "hearing is required only if the movant makes a sufficient threshold showing that material facts" bearing on the claim "are in doubt or dispute" (quoting United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996)).

Thus, we must review the denial of his motion for the evidentiary hearing for abuse of discretion.  Id.  And, as we will explain, we conclude that there was an abuse of discretion here.

**1.**

The government does not appear to contest the contents of what Daniells identified as the statements made by a grand jury witness to an investigator that implicated Spencer in having engaged in improper communications with witnesses.  Nor does the government dispute that an attorney investigated in connection with representing a client may create an actual conflict of interest.  Thus, the denial of the evidentiary hearing cannot be upheld based on Daniells's having failed to have made a case for there being any conflict at all.

**2.**

The question we next must address, then, concerns whether Daniells identified to the District Court factual disputes

bearing on whether Spencer had (1) plausible alternative strategies or tactics that (2) were inherently in conflict with or that may not have been undertaken due to his own interests or loyalties related to the asserted conflict.  See Ponzo, 853 F.3d at 575.  We conclude that he did.

**a.**

With respect to plausible alternative tactics or strategies, Daniells contended in his motion for an evidentiary hearing that Spencer failed to make a serious effort to show that Daniells did not in fact provide consent for the disclosure by his prior attorney, Schneider, of Daniells's cell phone passcode to the government.  Daniells pointed out that Spencer never objected to the government attorney's questioning of Schneider at the suppression hearing, even though the government attorney was the same attorney who received the passcode from Schneider and that attorney and Schneider were the only two who were present during the relevant conversations.  Daniells further pointed out that Spencer failed to make such an objection even though Schneider's testimony showed that Schneider could not remember whether Daniells had provided consent.  Daniels also pointed out that Spencer failed to make the objection even though Spencer never called that government attorney to elicit that attorney's version of the circumstances under which Schneider had provided the government the passcode despite the fact that Spencer told Daniells

that he would call that attorney to obtain that attorney's version of the events.

Daniells relatedly claimed that Spencer did not attempt to put on an expert witness to rebut the government agent's expert testimony that the government would have been able to access the phone's data even absent Schneider's provision of the passcode. And Daniells supported that contention below by citing to cases in which experts had concluded that an iPhone could not be accessed and in which Apple had refused to comply with a technical assistance order.

Notably, the government does not appear to contest on appeal that Daniells's contentions below sufficed to show that Daniells had identified "viable" alternative "strateg[ies] or tactic[s]" that Spencer could have pursued but did not. Brien, 695 F.2d at 15. Nor do we see a reason to conclude otherwise. See Daniells, 2018 WL 1639688, at *5 (concluding as a matter of fact that Daniells consented to "providing [the passcodes] to the government" and that the disclosure did not prejudice him based on expert testimony that the "extraction of data from the defendant's iPhone . . . was inevitable"). So, if there is a basis for the District Court to have denied the evidentiary hearing, that basis must be found elsewhere.

**b.**

We come, then, to the question whether Daniells made an adequate showing to the District Court that there were factual disputes as to whether Spencer's unpursued, viable alternatives would have been "inherently in conflict with" or "not undertaken" due to Spencer's own loyalties or interests. Ponzo, 853 F.3d at 575. To make that showing, Daniells contended that Spencer may have had an incentive to "curry favor with the government by not fully defending [him] against the government." And Daniells argued to the District Court that he could back up that contention as follows.

Daniells argued that he would be able to show more than that Spencer had been implicated in discouraging witnesses to cooperate with the government in Daniells's investigation and that the government was investigating Spencer's conduct in that regard. Daniells contended that he also would be able to show that Spencer did not take any steps to correct his actual or perceived impropriety or move to withdraw as counsel after the government witnesses had implicated him. Daniells then cited to decisions of other circuits that have found actual conflicts where defense counsel had been alleged to have been implicated in the same criminal investigation or charges as the defendant. See United States v. Fulton, 5 F.3d 605, 609 (2d Cir. 1993) (explaining that "[i]t is well-settled . . . that an actual conflict of interest

exists when an attorney engages in wrongful conduct related to the charge for which the client is on trial"); see also, e.g., Gov't of V.I. v. Zepp, 748 F.2d 125, 136 (3d Cir. 1984).

We note that in Fulton the Second Circuit described two ways in which an attorney might feel "conflicted" and thus susceptible to government pressure to avoid vigorously pursuing otherwise viable defense strategies in the face of allegations of involvement in the defendant's allegedly criminal conduct:

> First, if the allegations are true . . . the attorney may fear that a spirited defense could uncover convincing evidence of the attorney's guilt or provoke the government into action against the attorney. Moreover, the attorney is not in a position to give unbiased advice to the client about such matters as whether or not to testify or to plead guilty and cooperate since such testimony or cooperation from the defendant may unearth evidence against the attorney.
>   Second, even if the attorney is demonstrably innocent and the government witness's allegations are plainly false, the defense is impaired because vital cross-examination becomes unavailable to the defendant.

5 F.3d at 610 (citations omitted).

Moreover, the Third Circuit in Zepp explained that, where trial counsel has failed to take steps to avoid "professional impropriety [or] the appearance of impropriety" following allegations of involvement in the defendant's alleged criminal conduct, it "is unrealistic for [the] court to assume that [an] attorney vigorously pursued his client's best interest entirely

- 58 -

free from the influence of his concern to avoid his own incrimination." 748 F.2d at 136. Accordingly, the Third Circuit held, such "facts alone [would establish that] there was an actual conflict of interest which required withdrawal by trial counsel or disqualification by the court." Id.

Notwithstanding Fulton and Zepp, the government argues that Spencer's alleged failures to have pursued other tactics or strategies with respect to the suppression hearing cannot have been "connect[ed]" to a diverging interest. It reasons that Spencer would have had as much an interest as Daniells had himself in successfully litigating those suppression motions. After all, the government contends, Spencer would have wanted to curb the government's ability to use the assertedly damning material at Daniells's trial just as much as Daniells if Spencer were concerned about being investigated for his own wrongdoing.

But the critical question is whether Spencer may have had an incentive to pursue Daniells's defense less vigorously than Spencer would have if Spencer had no reason to avoid "provok[ing] the government into action against [him]." Fulton, 5 F.3d at 610; see also Zepp, 748 F.2d at 136. And, with respect to that question, we fail to see a basis for concluding that Spencer would have had no such incentive, given that the government does not contest the basis for concluding that Spencer was implicated in the conduct that the government itself was investigating.

Nor does our decision in United States v. Martorano, 620 F.2d 912 (1st Cir. 1980), suggest otherwise. There, we rejected a claim that the failure by an attorney who represented two clients to call a particular witness revealed an actual conflict. We did so because, "to the extent [the sought-after] testimony would have helped [one defendant], it would also . . . have helped" the other, such that the "interests" that had been identified "cut across both clients' cases." Id. at 917.

The relevant interests of defense counsel and the defendant here, however, were not similarly aligned. And that is precisely because of the defense counsel's asserted conflict. See id. Spencer's chief interest may not have been zealously defending a client, as it was in Martorano (albeit a co-defendant in that case). Spencer's chief interest may instead have been avoiding government action against himself -- an interest that a conflicted attorney may feel could be served by failing to mount a "spirited defense." Fulton, 5 F.3d at 610; see also Zepp, 748 F.2d at 136; cf. Colón-Torres, 382 F.3d at 88-89 (finding that remand for factfinding was warranted where there were "worrisome indications" that an attorney-client conflict existed because the attorney may have been "absorbed in defending his own performance").

We thus conclude that Daniells identified disputes bearing on the question of whether Spencer's viable alternatives were "inherently in conflict with" or "not undertaken" due to his

own loyalties or interests. We thus conclude that Daniells has shown that the District Court abused its discretion in denying him the evidentiary hearing.

### 3.

The government appears to argue in its supplemental brief that even if Daniells had met his burden in showing "that he was entitled to an evidentiary hearing . . . to substantiate his conflict allegation," he could not demonstrate "entitlement to substantive relief based on that alleged conflict, such as the reopening of the suppression record." In other words, the government claims, the proper relief for his actual conflict claim in this context would not have been a rehearing of the underlying suppression motions. The government thus contends that we may affirm the District Court's denial of the motion for a hearing on that ground.

But the government makes no argument that a suppression hearing that bears on the evidence presented at trial (like the one at issue here) is not a critical stage of the proceeding for which Sixth Amendment protections attach. See, e.g., United States v. Hamilton, 391 F.3d 1066, 1071 (9th Cir. 2004) (holding a suppression hearing was a "critical stage" of the proceeding as it bore on "evidence relating to [the defendant's] case"). We thus do not see on what basis we could conclude that the appropriate remedy for a successful actual conflict claim here would not be a

rehearing of the suppression motion that was infected by the conflict. And that is so because, once it has been shown that counsel at a critical stage labored under an actual conflict, we presume prejudice with respect to the relevant proceeding. See Mickens v. Taylor, 535 U.S. 162, 166 (2002) ("We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where . . . during a critical stage of the proceeding . . . the defendant's attorney actively represented conflicting interests.").

Thus, we remand for an evidentiary hearing on the attorney-conflict issue. For, even where actual-conflict-based Sixth Amendment claims have debuted for the first time on direct appeal, we have remanded for an evidentiary hearing to make the necessary findings to resolve the merits of the issue where the record shows "sufficient indicia" of an actual conflict. See, e.g., Colón-Torres, 382 F.3d at 90; see also, e.g., United States v. Segarra-Rivera, 473 F.3d 381, 384-85 (1st Cir. 2007) (taking a similar approach).[16] We similarly do so here, with directions for the District Court to make determinations as to the appropriate relief following the resolution of the actual conflict claim and,

---

[16] We also note that the government does not ask for us to defer resolution of this claim for future habeas proceedings. See Segarra-Rivera, 473 F.3d at 385 (explaining that, "unlike [Strickland] claim[s]," actual conflict claims are "not routinely relegated to collateral review").

if necessary, rehearing of the suppression motions.  See Colón-Torres, 382 F.3d at 90; Segarra-Rivera, 473 F.3d at 386–87.  Such determinations may include, if necessary, a determination as to whether the "judgment" of conviction must be "vacated," but we express no view on those issues at this time.  Colón-Torres, 382 F.3d at 78.[17]

## V.

Because we are not vacating Daniells's § 922(a)(1)(A) conviction, we conclude that it is prudent also to address his sentencing challenge, which concerns § 2K2.1(b)(5) of the Guidelines.  That guideline requires a four-level enhancement to a defendant's total offense level if the "defendant engaged in the trafficking of firearms."  U.S.S.G. § 2K2.1(b)(5).

The source of the dispute is an application note for § 2K2.1(b)(5).  The application note provides that the enhancement applies where the "defendant . . . transported, transferred, or otherwise disposed of two or more firearms to another individual," and "knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an

---

[17] To the extent that Daniells suggests that we should go one step further and vacate his § 922(a)(1)(A) conviction if we are persuaded that he was entitled to a hearing on his actual conflict claim, we do not agree.  Unless Daniells were to be successful on both the actual conflict claim and on the rehearing of the underlying suppression motion on remand, the evidence introduced at trial would remain unaffected by the relief that we grant today.

individual" whose "possession or receipt of the firearm would be unlawful" or "who intended to use or dispose of the firearm unlawfully." Id. cmt. n.13(A).

Daniells argued at sentencing, as he does on appeal, that the "trafficking" enhancement had no application to him because -- at least given the application note -- it applies only if the government demonstrates that the defendant transferred two or more guns to a single recipient. The District Court disagreed, ruling that the enhancement applies so long as the evidence shows by a preponderance -- as even Daniells agrees it did in his case -- that the defendant had sold multiple weapons, even if he sold only a single weapon to a single person on multiple occasions.

The government accepts that Daniells preserved this challenge below, such that our review of whether the District Court erred in interpreting the "legal meaning and scope" of the guideline is de novo. See United States v. Carrero-Hernández, 643 F.3d 344, 349 (1st Cir. 2011) (quoting United States v. Thompson, 32 F.3d 1, 4 (1st Cir. 1994)). We interpret the guidelines, as well as the Sentencing Commission's commentary, including application notes, "using conventional methods of statutory construction." United States v. Damon, 595 F.3d 395, 400 n.3 (1st Cir. 2010); see United States v. Almeida, 710 F.3d 437, 441 n.3 (1st Cir. 2013) (explaining that "[t]he Sentencing Commission's commentary, including the application notes, is binding on the

courts as long as it does not conflict either with the sentencing guidelines themselves or with some statutory provision" (quoting United States v. Carrasco-Mateo, 389 F.3d 239, 244 (1st Cir. 2004))).

As both parties acknowledge, only one circuit -- the Sixth Circuit -- has decided the question Daniells asks us to decide, and it has construed the guideline as Daniells contends that it must be construed. See United States v. Henry, 819 F.3d 856, 871 (6th Cir. 2016) (holding that § 2K2.1(b)(5) applies only to "defendants who provide multiple firearms to at least one buyer or other transferee -- i.e., parties engaging in bulk transfers" and vacating the defendant's sentence as a result). The District Court "disagree[d] respectfully" with the Sixth Circuit, however. It did not dispute that the application note had to be given consideration in construing the guideline. But it concluded that Henry had put too much "emphasis" on the application note's use of the word "individual," adding that the word "[t]rafficking itself suggests more than one customer for the guns."

We do not disagree with the District Court that the word "trafficking," if considered on its own, would appear to permit a construction of the guideline that would encompass engaging in multiple individual guns sales and thus favor the government's reading. See Traffic, Black's Law Dictionary (11th ed. 2019) (defining the term "traffic" as either "[c]ommerce; trade; the

sale or exchange of such things as merchandise, bills, and money," or, "[t]o trade or deal in (goods, esp[ecially] illicit drugs or other contraband)"); Traffic, Webster's Dictionary, https://www.merriam-webster.com/dictionary/traffic (defining the term "traffic" as, among other things, "import and export trade," "the business of bartering or buying and selling," or "illegal or disreputable usually commercial activity"). But the question is whether, in consequence of the application note, the guideline is narrower in scope than its text, in a different context, might suggest. See, e.g., United States v. Paneto, 661 F.3d 709, 711, 717 (1st Cir. 2011) (explaining that an application note may "clarify" the "scope of [a] phrase" in a guideline so long as the note is "neither inconsistent with, nor an obviously erroneous reading of, the guideline"); Stinson v. United States, 508 U.S. 36, 38 (1993) (explaining that "commentary . . . that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

Daniells asserts that the application note's text -- given its use of the phrase "to another individual" -- plainly reveals that to be the case, because the text of the application note refers to the transfer of two or more firearms to a single individual. In other words, Daniells contends, in consequence of the application note, the guideline must be construed to require

- 66 -

an enhancement only where the defendant engaged in "bulk transfers" of firearms, just as Henry determined.  See 819 F.3d at 871.

The government has not suggested, either below or on appeal, that such a reading of the application note would conflict with the text of the guideline and so must be rejected for that reason alone.  See Almeida, 710 F.3d at 441 & n.3; Stinson, 508 U.S. at 38.  The government instead contends only that the application note itself is best read to support its view that the phrase "trafficking of firearms" is more expansive than Daniells contends.

The government asserts in that regard that the words "another individual" in the application note serve only the limited purpose of indicating that the "transport[], transfer[], or dispos[al]" of the firearms in question, see § 2K2.1 cmt. n.13(A)(i), must have been to other people in the general sense (rather than to one other person).  It reasons that, absent that phrase, the guideline might be read to apply to someone who transported or disposed of firearms without doing so to "another" person.

The use of the word "another" indicates, however, that the noun that follows is intended to be singular.  See Another, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/another (defining the word "another" as "some other," or "being one more in addition to one or more of the

same kind"); Another, Oxford English Dictionary Online, https://www.oed.com/view/Entry/8102 (defining the word "another" as "[o]ne more, one further"). And, here, the word "another" is modifying a word that itself suggests a singular meaning -- "individual." See, e.g., Hertz Corp. v. Friend, 559 U.S. 77, 93 (2010) (noting that when an adjective emphasizes a noun's singularity, the plain meaning is more likely to incorporate the singular version of the noun it modifies). Moreover, "another individual" is used here in a prepositional phrase -- "to another individual" -- that is describing who must have been on the receiving end of the defendant's "transfer[], transport, or dispos[al]" of two or more firearms. See U.S.S.G. § 2K2.1 cmt. n.13(A) ("Subsection (b)(5) applies . . . if the defendant . . . transported, transferred or otherwise disposed of two or more firearms to another individual . . . ." (emphases added)).

The "structure" of the relevant Guidelines provisions reinforces the textual reasons to favor Daniells's reading. See Henry, 819 F.3d at 871. A separate subsection of the same guideline -- § 2K2.1(b)(1) -- provides for incremental increases to a defendant's offense level where "the offense involved three or more firearms." Under the government's reading of the application note, (b)(5) would apply where the defendant engaged in multiple individual gun transfers, even though (b)(1) itself already covers such cases. See id. Thus, we agree with Henry

- 68 -

that, when "[r]ead in conjunction with subsection (b)(1)" and in light of the plain text of the application note, subsection (b)(5) is best read "to be aimed at defendants who provide multiple firearms to at least one buyer or other transferee."  Id.

The government does attempt to respond to this last point by asserting that "double counting" is not inherently improper. See United States v. Zapata, 1 F.3d 46, 47 (1st Cir. 1993).  But the point is not that Daniells's -- and Henry's -- reading of the application note is better because double-counting is prohibited. The point is that -- in the context of interpreting the text of § 2K2.1(b)(5) and its commentary -- the provision is best given independent meaning if read as being aimed at "bulk" gun transfers, because engaging in multiple individual gun transfers is conduct that would be subject to enhancements based on the total number of firearms implicated by the defendant's conduct.  See U.S.S.G. § 2K2.1(b)(1) & cmt. n.5; Henry, 819 F.3d at 871.  Given that such a reading comports with the least strained reading of the application note, we conclude that the District Court erred in applying the four-level § 2K2.1(b)(5) enhancement to Daniells on the ground that the record showed that he had engaged in multiple individual gun transfers.

The government does argue that the interpretive error was harmless, insofar as the error exists.  United States v. Larios, 593 F.3d 82, 89 (1st Cir. 2010) ("We need not remand for

resentencing if we conclude, 'on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed.'" (quoting Williams v. United States, 503 U.S. 193, 203 (1992))). The government emphasizes that the trial evidence -- specifically, the testimony by Copithorne -- supports a finding that Daniells transferred at least two firearms to a single recipient -- Figueroa. We note as well that the District Court stated during Daniells's sentencing hearing that, even if it were to adopt the government's view of the evidence, the enhancement would apply based on the interpretation pressed by Daniells "as well."

But the government concedes that the District Court did not find that the evidence showed what the government contended that the evidence showed. Indeed, the District Court expressly stated that it was not "opin[ing] one way or the other" on the issue, and Daniells does contest that the record supports the government's view of the evidence. Thus, because the evidence does not compel the conclusion that Daniells transferred two or more guns to a single individual -- nor does the government contend as much -- we cannot be sure that the District Court would have in fact determined that the enhancement should be applied, at least under a proper understanding of the "trafficking of firearms" guideline. We therefore cannot affirm the District Court's sentencing decision on harmless error grounds.

## VI.

We **vacate** Daniells's § 922(n) conviction, **vacate** his sentence, and **remand** for further proceedings consistent with the foregoing opinion.


**-Concurring Opinion Follows-**

**LIPEZ, Circuit Judge, concurring.** I join the panel's opinion. I write separately only to emphasize the narrowness and fact-specificity of the opinion's holding that the district court erred in denying Daniells's requested instruction to the jury on the "willfully" element, see 18 U.S.C. § 924(a)(1)(D), of his offense under § 922(n).

As my colleagues note, in reviewing a district court's refusal to give a requested instruction, we first ask whether there is sufficient evidence to support the proposed instruction. See United States v. McLellan, 959 F.3d 442, 467 (1st Cir. 2020). If the evidence can plausibly support the theory of the defense, we then assess whether the district court's refusal constitutes reversible error by engaging in a three-pronged inquiry that asks if the requested instruction was (1) "substantively correct as a matter of law," (2) "not substantially covered" by the instruction as given, and (3) "integral to an important point in the case" such that "omission of the instruction seriously impaired the defendant's ability to present his defense." Id. (quoting United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013)).

Ordinarily, a defendant who -- like Daniells -- requests an instruction that, to prove that he "willfully" violated § 922(n), the government must prove that he knew he was "under indictment," could not show that the proffered instruction was "substantively correct as a matter of law" under the first prong

- 72 -

of the McLellan test.  Id. (quoting Baird, 712 F.3d at 628).  That is so because precedent interpreting the term "willfully" in 18 U.S.C. § 924(a)(1)(D), the statutory provision which attaches a "willfully" mens rea element to § 922(n) and other firearms offenses,[18] stands firmly against the proposition that proving a "willful" violation of § 922(n) generally requires proof not only that the defendant knew his conduct was unlawful, but also proof that the defendant had specific knowledge of the law that made his conduct unlawful.

In United States v. Andrade, 135 F.3d 104 (1st Cir. 1998), this court considered a challenge to the district court's instruction on the standard required to prove that the defendant "willfully" engaged in a conspiracy to deal in firearms without a license.  See 18 U.S.C. §§ 371, 922(a)(1)(A).  As with § 922(n), § 924(a)(1)(D) attaches a "willfully" element to the offense defined in § 922(a)(1)(A).  The defendant sought an instruction requiring proof that he knew that § 922(a)(1)(A) requires those who deal in firearms to obtain a federal dealer's license. Andrade, 135 F.3d at 108.  The district court refused to give the proffered instruction, and instead instructed the jury that

---

[18] Section 924(a)(1) assumed its current form in 1986, when Congress enacted the Firearms Owners' Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449, to add a "willfully" mens rea element to some offenses defined in § 922 and a "knowingly" mens rea element to others.  See Bryan v. United States, 524 U.S. 184, 188-89 (1998).

proving the "willfully" element requires only proof that the defendant intentionally committed the prohibited act "with knowledge that his conduct [was] unlawful." Id.

Surveying the treatment of this issue among the federal courts of appeal, this court rejected the view of some circuits that proving the "willfully" element of a § 922(a)(1)(A) offense requires proof that the defendant was aware of the legal basis for the prohibition of his conduct. Id. at 109. Requiring "specific awareness of the statute" that makes a defendant's conduct unlawful, id., would make enforcement of the gun laws unduly difficult, since convictions would then require proof of "detailed knowledge of the firearms statutes" on defendants' part, id. at 108. The Andrade court held instead that, to satisfy the "willfully" element of § 922(a)(1)(A), "it is enough that the defendant be aware that his conduct is unlawful." Id. at 110.

Shortly after Andrade was decided, the Supreme Court considered this same issue to resolve a conflict among the circuits. See Bryan v. United States, 524 U.S. 184 (1998). The Court resolved the conflict by rejecting the view that proof of the "willfully" element requires the "particularized showing" that the defendant "was aware of the federal law that prohibits dealing in firearms without a federal license." Id. at 192, 189. Adopting the position taken by this court in Andrade, the Court held that for a defendant to act "willfully," as that mental state is set

out in § 924(a)(1)(D), the defendant's "knowledge that [his] conduct is unlawful is all that is required." Id. at 196.

In light of Andrade and Bryan, a defendant's request to instruct the jury that proof of the "willfully" element of § 922(n) requires proof of his knowledge that he was "under indictment" would normally fail, as I indicated, at the first prong of the McLellan test as an incorrect statement of the law. Daniells is able to overcome this hurdle only because of unusual facts in his case.

On March 27, 2015, Daniells bought two guns through a straw purchaser named William Roberts. Three days later, Daniells sold one of these guns, a Smith & Wesson pistol, to Timothy Bailey, having previously learned of Bailey's interest in buying a gun from him. That pistol was the firearm that grounded Daniells's conviction for receiving a firearm while "under indictment" for a crime punishable by more than one year's imprisonment, in violation of § 922(n) -- the act of receipt being his taking of the gun from Roberts following the straw purchase. This same gun was also one of the firearms underlying Daniells's conviction for "dealing" in firearms without a license, in violation of § 922(a)(1)(A). In this way, Daniells's conduct violating § 922(n) was embedded in his conduct in violation of § 922(a)(1)(A), the receipt of the Smith & Wesson pistol from Roberts being simply one step in a broader effort by Daniells to procure a gun to sell to Bailey.

Because Daniells's conduct constituting the § 922(n) offense of unlawfully receiving was so embedded within his conduct constituting the separate § 922(a)(1)(A) offense of unlawfully dealing, much of the evidence in the record regarding his state of mind is reasonably open to interpretation. As my colleagues explain, there is evidence that Daniells switched to buying firearms through straw purchases following the issuance of the Massachusetts criminal complaints, that Daniells made a statement expressing concern about being caught by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and that Daniells encouraged Roberts to conceal from ATF investigators the fact that he had given Daniells the guns he had bought as straw purchases on Daniells's behalf. This evidence plausibly shows that Daniells knew that it was unlawful for him to receive the Smith & Wesson pistol from Roberts. But because he took the pistol from Roberts in the service of a wider plan to sell it to Bailey, this same evidence also plausibly shows only his awareness that he was acting unlawfully by dealing in firearms without a license.

The only evidence that unequivocally supports a finding that Daniells knew that it was unlawful for him to receive the firearm at issue is the evidence that, when making firearms purchases in 2012 and 2013, he filled out ATF forms advising would-be gun purchasers that, under § 922(n), individuals who are "under indictment" for a felony are prohibited from receiving or

possessing firearms. Hence, as the government concedes,[19] the only evidence in the record that suffices to prove beyond a reasonable doubt that Daniells knew the specific conduct of receiving the Smith and Wesson pistol was unlawful was the evidence that he was aware of being "under indictment" at the time he received the pistol. It was only because of this peculiarity of the record in this case that Daniells's requested "willfully" instruction, requiring proof of his knowledge that he was "under indictment," was legally correct.

Given that Daniells's conduct violating § 922(n), the receiving offense, was embedded within his conduct violating § 922(a)(1)(A), the dealing offense, the instruction actually given by the district court was inadequate under the second prong of the McLellan test. See United States v. DeStefano, 59 F.3d 1, 2-3 (1st Cir. 1995). This is so because the district court's explanation of the "willfully" element in terms of an "intent to do something that the law forbids" (emphasis added) was unacceptably ambiguous as to what conduct -- receiving or dealing

---

[19] The government asserted in its supplemental brief that the "jury could not have found that Daniells acted 'willfully' without also finding beyond a reasonable doubt that he knew his criminal complaints qualified as 'indictments' because that was the only reason, as a factual matter, that Daniells would have thought his conduct [in receiving the Smith & Wesson pistol] was unlawful." The government also stated, in its principal brief, that the "evidence that Daniells was aware he was acting unlawfully in receiving [the pistol]" was "predicated on his knowledge of his prohibited status."

in firearms -- Daniells had to know was unlawful to "willfully" violate § 922(n). To have "'adequately illuminate[d] the law applicable' to the issue," United States v. Sandoval, 6 F.4th 63, 99 (1st Cir. 2021) (quoting DeStefano, 59 F.3d at 3), the court's instruction had to make clear to the jurors that for the government to prove the "willfully" mens rea element of the § 922(n) offense, it had to prove that Daniells knew that his act of receiving the pistol specifically -- and not only his larger plan to sell the pistol he thus obtained for Bailey -- was unlawful. Indeed, if the circumstances of the case had been different, such that the referent for the "something that the law forbids" would have been unambiguous, then the instruction given by the court would have sufficed.[20]

In sum, although I join my colleagues in concluding that Daniells's challenge to the district court's "willfully" instruction succeeds under each prong of the McLellan test,[21] I emphasize that his challenge succeeds only because of the unusual

_____

[20] Indeed, the district court's "willfully" instruction largely echoed the corresponding instruction blessed by the Bryan Court. See 524 U.S. at 190.

[21] Daniells can satisfy the third prong of the McLellan test because, as my colleagues explain, if the jury had believed that he did not know that he was "under indictment," there would have been no basis in the record to find beyond a reasonable doubt that he had the requisite mens rea to find him guilty on the § 922(n) offense. Accordingly, Daniells's instructional challenge went to an issue that was "integral to [his] case." Baird, 712 F.3d at 633.

relationship between his conduct in violation of § 922(n) and his conduct constituting the § 922(a)(1)(A) offense. Because the outcome of Daniells's instructional challenge here turns on heavily case-specific factors, this case leaves unchanged the law on the "willfully" mens rea element that § 924(a)(1)(D) attaches to the § 922(n) offense. As a general matter, to prove a "willful" violation of § 922(n), it is enough for the government to prove that the defendant committed the act proscribed by the statute with the knowledge that this conduct was unlawful. The government does not have to prove knowledge of the specific basis in law that made his conduct unlawful.